**Exhibit 2**

TOGUT, SEGAL & SEGAL LLP
One Penn Plaza, Suite 3335
New York, New York 10119
(212) 594-5000
Albert Togut
Jeffrey R. Gleit
Anthony F. Pirraglia

*Proposed Attorneys for James S. Feltman,*
 *Not Individually But Solely in His Capacity*
 *as Chapter 11 Trustee*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
                                                             :
In re:                                                       :      Chapter 11
                                                             :
                                                             :      Case No. 15-10243 (MG)
TS EMPLOYMENT, INC.,                                         :
                                                             :
                              Debtor.                        :
                                                             :
-------------------------------------------------------------X

**DECLARATION OF JAMES S. FELTMAN, CHAPTER 11 TRUSTEEE,  IN SUPPORT OF APPLICATION OF THE TRUSTEE FOR AN INTERIM ORDER PURSUANT TO 11 U.S.C. §§ 105(A), 363, 364(C)(1), (C)(2) AND (C)(3) FOR APPROVAL OF FUNDING ARRANGEMENT BETWEEN THE TRUSTEE, WELLS FARGO BANK, STERLING NATIONAL BANK AND CORPORATE RESOURCE SERVICES, INC.**

      I, James S. Feltman, not individually but solely in my capacity as the Chapter 11 Trustee (the "Trustee") of the estate of TS Employment, Inc. (the "Debtor"), declare under the penalty of perjury that the following is true to the best of my knowledge, information and belief:

      1.    I am a Senior Managing Director of Mesirow Financial Consulting, LLC ("MFC"), a professional services firm engaged in the business of providing financial advisory and related professional consulting services.  I have over 30 years of experience providing a broad range of litigation, forensic and investigative services.  In that capacity, I have been engaged to provide both consulting and expert testimony in,

among other things, the areas of money laundering, Ponzi schemes, asset tracing and recovery, accounting and financing statement reporting issues, potential causes of action against current and former officers, directors and third parties, securities fraud, misrepresentation, hedging and trading in complex securities schemes and bankruptcy and insolvency issues. Over the past twenty years, I have served as a Chapter 11 trustee or court-appointed examiner in bankruptcy cases throughout the country, including *In re Fisher Island Investments, Inc., et al.*, Ch. 11 Case No. 11-17047 (Bankr. S.D. Fla. Mar. 17, 2011) (examiner); *In re Syntax-Brillian Corp., et al.*, Ch. 11 Case No. 08-11407(BLS) (Bankr. D. Del. July 8, 2008) (examiner); *In re Certified HR Services Company f/k/a The Cura Group, Inc.*, Ch. 11 Case No. 05-22912 (Bankr. S.D. Fla. May 12, 2005) (Chapter 11 trustee); *In re American Way Service Corp.*, Ch. 11 Case No. 94-24696 (Bankr. S.D. Fla. Dec. 2, 1994) (Chapter 11 trustee); *In re 25 Travel, Inc.*, Ch. 11 Case No. 92-15634 (Bankr. S.D. Fla. Sept. 22, 1992) (examiner); *In re Cascade International, Inc.*, (Bankr. E.D. Pa. June 22, 1990) (examiner). I have specific experience as a Chapter 11 trustee of a PEO.

2. I am in all respects competent to make this declaration (the "Declaration") in support of the *Application of the Trustee for an Interim Order Pursuant to 11 U.S.C. §§ 105(a), 363, 363(c)(1), (c)(2) and (c)(3) for Approval of Funding Arrangement Between the Trustee, Wells Fargo Bank, Sterling National Bank and Corporate Resources Services, Inc.* (the "Application"),[1] which seeks, among other things, this Court's approval of the Stipulation and Order and post-petition financing as contemplated thereunder. Unless otherwise stated, based on my investigation, consultation with my advisors and review of relevant documents, I have personal knowledge of the facts set

---

[1] Capitalized terms used herein and not otherwise defined shall have the meanings ascribed to such terms in the Application.

forth herein. If called upon to testify, I could and would testify competently to the facts set forth herein.

3. I have reviewed the Application or have otherwise had its contents explained to me and, to the best of my knowledge as I have been able to ascertain after reasonable inquiry, I believe that approval of the relief requested therein is necessary to preserve and maximize the value of the Estate, as it ensures the availability of funds to cover certain cash shortfalls that may arise as a result of the Debtor's post-Trustee appointment operations and fund an investigation of potential claims and causes of action held by the Estate.

**A. The Debtor's Business and Commencement of this Chapter 11 Case**

4. The Debtor is a PEO that provides payroll-related services to its affiliate and sole client, Corporate Resource Services, Inc. ("CRS"). I understand that CRS, through its wholly owned subsidiaries, provides, among other things, staffing, recruiting and consulting services to various third parties. I further understand that CRS's ongoing operations are dependent on the continued operation of the Debtor's payroll processing services.

5. In providing its staffing services, CRS assigns employees to work for third party clients as temporary personnel. The Debtor, acting in its capacity as PEO, enters into client service agreements with CRS entities, pursuant to which the Debtor agrees to pay all wages, Federal and State payroll taxes (including withholding, unemployment and other payroll-related taxes), provide worker compensation insurance coverage and related health care expenses paid as part of the payroll ("Payroll Obligations").

6. The Debtor has no independent source of funding and relies upon CRS to fund outstanding Payroll Obligations. The Debtor incurs millions of dollars of

3

Payroll Obligations on a daily basis and bills CRS for those Payroll Obligations in arrears. I understand that CRS subsequently bills the third party clients and relies primarily upon an account purchase agreement (the "CRS Loan Facility"), by and between CRS and its subsidiaries (the "CRS Borrowers") and Wells Fargo Bank, National Association ("Wells Fargo") and Sterling National Bank ("Sterling" and together with Wells Fargo, the "Lenders"), to fund the Debtor and its Payroll Obligations. The Debtor's only source of funding for its payroll services comes directly from funds provided by CRS.

7. I understand that, in late January, CRS and the Lenders discovered that the Debtor had outstanding tax obligations of as much as $100 million. Shortly thereafter the Debtor filed its voluntary petition for relief under Chapter 11 of the Bankruptcy Code.

8. Based on the records I have seen and pleadings filed in the case, on the Petition Date, the Debtor provided payroll-related services for approximately 30,000 staffers of CRS. That number has decreased significantly, and I expect it will continue to decrease during the pendency of this case. Based upon current information, I believe that the Debtor is currently providing payroll services for less than 19,000 persons. I understand that CRS will not require the use of the Debtor's payroll services after April 30, 2015.

9. Once CRS no longer requires the Debtor's payroll services, my primary focus will be conducting an investigation of circumstances surrounding the missing $100 million as well as any and all actions that resulted in the demise of the Debtor. I believe that claims and causes of action identified through such an investigation are likely the Estate's most valuable asset.

10. The Debtor currently does not have the necessary funds available for me to conduct this investigation and administer the Estate.

B. **The Post-Petition Financing**

11. Access to post-petition financing is essential for my investigation and the administration of this Chapter 11 case. The Debtor's only purpose is to service the payroll obligations for CRS staffers. Because the Debtor bills CRS only after it incurs Payroll Obligations, the Estate is at risk of being left with outstanding Payroll Obligations when CRS ceases to operate. The Estate has *de minimis* cash on hand and no source of income. I cannot administer the Estate without a commitment from CRS and the Lenders to fund Payroll Obligations, which continue to accrue, and the Estate lacks capital to fund an investigation.

12. Given the status of the Debtor's financial affairs, the Estate's current sole source of funds to meet Payroll Obligations is the monies provided by CRS. Without such funding, I would be forced to terminate the Debtor's operations immediately, which could result in displacement of these staffers and the elimination of any potential recovery on an approximately $52 million receivable owed by CRS to the Debtor. Though recovering on the receivable may be unlikely, I believe that a smooth transition of the Debtor's payroll services to other payroll providers is beneficial to the Estate.

13. Moreover, realizing the value of the Estate's claims and causes of action requires a comprehensive investigation of the Debtor, its affiliates, former management and other third parties by skilled and experienced professionals.

14. Consequently, I, in consultation with my advisors, determined that the Debtor has an immediate need for post-petition financing. From the date of my appointment, I, with the assistance of my proposed attorneys, engaged in negotiations

5

with the Lenders, CRS and their respective counsel to ensure that CRS and the Lenders advance to the Estate sufficient funds to meet the Debtor's Payroll Obligations and provide additional funding to conduct an investigation. These negotiations culminated in that certain term sheet for post-petition financing, dated March 24, 2015 (the "Term Sheet"), which terms have been incorporated into the Stipulation and Order. I believe that the financing available under the Stipulation and Order is superior to any financing that the Estate would be able to obtain from a third party lender.

15. Importantly, the TSE Advance provides me with sufficient assurance that the Lenders will continue funding CRS's and TSE's operations long enough to meet CRS's needs. Further, access to the TSE Advance is essential for me to retain professionals with the requisite expertise to perform the due diligence necessary to assess, identify and pursue potential claims that may be realized upon for the benefit of the Estate.

16. I believe that approval of the Stipulation and Order will ensure the Estate has the funds necessary to fulfill Payroll Obligations and attendant operating expenses and provide access to cash that is essential for me to retain professionals necessary to investigate and pursue claims and causes of action to maximize the value for the Estate.

17. Given the Debtor's financial condition, I do not believe at this point in the case that I would be able to obtain financing on an unsecured basis or even on a superpriority basis under section 364(c)(1) of the Bankruptcy Code, on terms more favorable than those of the TSE Advance. Similarly, even if I were to solicit offers for financing secured by liens on the Debtor's unencumbered assets and junior liens on the Debtor's encumbered assets, I believes that such financing, if it were even available at this time, would provide for terms that are far more onerous than those of the TSE

Advance, including an interest rate, strict default provisions, a fixed term, and countless other fees (i.e. commitment fees, exit fees, monitoring fees, etc.). Although the TSE Advance contemplates granting liens on the proceeds of Chapter 5 Actions, I believe such liens are appropriate given the Debtor's lack of other valuable assets. Finally, CRS and the Lenders have a substantial interest in the continued operation of the Debtor and, therefore, are willing to provide the TSE Advance on terms that are favorable to the Debtor. Accordingly, I determined that the best course of action for the Estate is to pursue financing options from its affiliate, CRS and the Lenders.

18. CRS, the Lenders and I were each represented by separate counsel in connection with the negotiation of the TSE Advance. After good faith negotiations, the terms set forth in the Term Sheet and the Stipulation and Order were agreed upon. The TSE Advance reflects the most advantageous terms (including availability, pricing, and fees) available to the Trustee in light of the Debtor's financial circumstances.

19. The terms of the TSE Advance and the Stipulation and Order related thereto are fair and reasonable and were negotiated in good faith and at arm's length among the parties, culminating in an agreement designed to provide the Estate and me with funding and protections necessary to maintain the Debtor's ongoing business operations long enough to meet CRS's need for payroll services. Additionally, the TSE Advance will allow me, with the assistance of Estate professionals, to investigate, identify and eventually pursue claims and causes of action to unlock value for the Estate. Lastly, the TSE Advance provides sufficient assurances that the Lenders will make sufficient funds available to the Debtor (through CRS or otherwise) to meet Payroll Obligations.

20. I submit that I have exercised sound and prudent business judgment in determining the merits and necessity of the TSE Advance.

Pursuant to 28 U.S.C. § 1746, I declare under the penalty of perjury that the foregoing is true and correct.

Executed on March 25, 2015 in New York, New York

/s/ James S. Feltman
JAMES S. FELTMAN