TOGUT, SEGAL & SEGAL LLP
One Penn Plaza, Suite 3335
New York, New York 10119
(212) 594-5000
Albert Togut
Steven S. Flores
Anthony F. Pirraglia

*Proposed Attorneys for James S. Feltman,*
 *Not Individually But Solely in His Capacity*
 *as Chapter 11 Trustee*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
                                                              :
In re:                                                        :    Chapter 11
                                                              :
                                                              :    Case No. 15-10243 (MG)
TS EMPLOYMENT, INC.,                                          :
                                                              :
                         Debtor.                              :
                                                              :
-------------------------------------------------------------X

**DECLARATION OF
JAMES S. FELTMAN, CHAPTER 11 TRUSTEE,
IN SUPPORT OF *EX PARTE* APPLICATION**

I, James S. Feltman, not individually but solely in my capacity as the Chapter 11 Trustee (the "Trustee") of the estate of TS Employment, Inc. (the "Debtor" or "TSE"), declare under the penalty of perjury that the following is true to the best of my knowledge, information and belief:

      1.     I am a Senior Managing Director of Mesirow Financial Consulting, LLC ("MFC"), a professional services firm engaged in the business of providing financial advisory and related professional consulting services. I have nearly 30 years of experience providing a broad range of litigation, forensic and investigative services. In that capacity, I have been engaged to provide both consulting and expert testimony in, among other things, the areas of money laundering, Ponzi schemes, asset tracing and recovery, accounting and financing statement reporting issues, potential causes of

action against current and former officers, directors and third parties, securities fraud, misrepresentation, hedging and trading in complex securities schemes and bankruptcy and insolvency issues. Over the past twenty years, I have served as a Chapter 11 trustee or court-appointed examiner in bankruptcy cases throughout the country, including *In re Fisher Island Investments, Inc., et al.*, Ch. 11 Case No. 11-17047 (Bankr. S.D. Fla. Mar. 17, 2011) (examiner); *In re Syntax-Brillian Corp., et al.*, Ch. 11 Case No. 08-11407(BLS) (Bankr. D. Del. July 8, 2008) (examiner); *In re Certified HR Services Company f/k/a The Cura Group, Inc.*, Ch. 11 Case No. 05-22912 (Bankr. S.D. Fla. May 12, 2005) (Chapter 11 trustee); *In re American Way Service Corp.*, Ch. 11 Case No. 94-24696 (Bankr. S.D. Fla. Dec. 2, 1994) (Chapter 11 trustee); *In re 25 Travel, Inc.*, Ch. 11 Case No. 92-15634 (Bankr. S.D. Fla. Sept. 22, 1992) (examiner); *In re Cascade International, Inc.*, (Bankr. E.D. Pa. June 22, 1990) (examiner). I have specific experience as a Chapter 11 trustee of a professional employer organization.

2. I am in all respects competent to make this declaration (the "Declaration") in support of the Ex Parte *Application of the Chapter 11 Trustee for an Order to Preserve Debtor and Related Company Documents and to Allow the Trustee Immediate Access to Computer Servers Used by the Debtor to Copy Contents.* (the "Application").[1] Unless otherwise stated, based on my investigation, consultation with my advisors and review of relevant documents, I have personal knowledge of the facts set forth herein. If called upon to testify, I could and would testify competently to the facts set forth herein.

3. I have reviewed the Application or have otherwise had its contents explained to me and, to the best of my knowledge as I have been able to ascertain after

---

[1] Capitalized terms used herein and not otherwise defined shall have the meanings ascribed to such terms in the Application.

2

reasonable inquiry, I believe that approval of the relief requested therein is necessary to prevent irreparable harm to the Debtor's estate.

### A. The Debtor's Business and Chapter 11 Filing

4. Based on information obtained by my advisors, it appears that the Debtor exists primarily, if not solely to facilitate the business of Corporate Resource Services ("CRS"), the Debtor's affiliate and sole customer.

5. I understand that, in late January 2015, CRS and the Lenders discovered that the Debtor had outstanding tax obligations of as much as $100 million. That liability is grossly inconsistent with the Debtor's filed federal tax returns. The Debtor has not offered an explanation for that non-payment.

6. Shortly thereafter, on February 2, 2015 (the "Petition Date") the Debtor filed its voluntary petition for relief under Chapter 11 of the Bankruptcy Code.

7. On or about February 9, 2015, the Debtor received a letter from the United States Securities and Exchange Commission ("SEC"), annexed hereto as Exhibit 1, which required the Debtor to preserve documents.

8. Based on the records I have seen and pleadings filed in the case, on the Petition Date, the Debtor provided payroll-related services for approximately 30,000 staffers of CRS, and the Debtor's sole source of funding for its payroll services comes directly from CRS. CRS is currently in the process of selling or otherwise transitioning customer contracts, which has resulted in a significant decrease in the number of persons for which the Debtor has to provide payroll services.

9. I understand that CRS intends to terminate, sell or transition all of its employees and customer contacts, which will ultimately result in the cessation of the Debtor's payroll services for its only client. CRS' sale process is now almost complete.

3

10. Once CRS no longer requires the Debtor's payroll services, my primary focus will be continuing my investigation. I believe that claims and causes of action identified through such an investigation are likely the Estate's most valuable asset class. While my investigation is its preliminary stages, there appears to have been a massive fraud involving the Debtor.

**B. Status of the Investigation**

11. I have only recently begun to gain access to documents and information concerning the Debtor's financial affairs, and it is apparent that documents and information concerning the Debtor are located in numerous locations at the Debtor's premises.

    *a. Intertwined Non-Debtor Entities*

12. Robert Cassera ("Cassera"), the sole shareholder and the President of the Debtor, signed the Debtor's Chapter 11 Petition [Dkt. No. 1].

13. According to information obtained by the Trustee, Cassera (i) owns 89.7% of the outstanding common stock of CRS and (ii) is (or was) an officer of at least 20 non-debtor entities registered in the State of Florida, and (iii) has owned or effectively controlled numerous other entities that may have used the same personnel, systems and servers as the Debtor (the "Tri-State Entities"). A list of Cassera-related entities is attached hereto as Exhibit 2.

14. Many of the Tri-State Entities are listed (at least 20) as having a principal place of business at the Debtor's premises [Dkt. No. 21 ¶ 30]. I understand that many of the Tri-State Entities use at least some of the same computer systems and servers as the Debtor and therefore would have the ability to remove and/or delete Debtor computer files.

4

b. *Questionable Related-Entity Transactions*

15. I understand that at least some of the Tri-State Entities have engaged in suspicious or lopsided business transactions with the Debtor, which has hindered the Debtor's ability to pay its creditors, such that they may have a motive to remove or delete Debtor records in order to impede the Trustee's investigation. By way of example only, during 2013 and 2014, the Debtor appears to have paid Tri-State (defined below) $84 million more than it received. During the same period, the Debtor apparently made more than $30 million in unexplained payments to a related company named "Broadway PEO" for no discernable reason. Tri-State Entities have charged the Debtor approximately $20 million in overhead allocations in 2012 and 2013 according to TSE's federal tax filings.

C. **Existing Litigation Holds Are Insufficient**

16. I understand that in connection with the SEC litigation hold, the Debtor and CRS retained counsel.

17. The Debtor hired Proskauer Rose, LLP ("Proskauer"), after the Petition Date, without the Trustee's knowledge or consent. Proskauer has not been retained by the Trustee or the estate pursuant to a court Order. Moreover, Proskauer is not acting at the direction of the Trustee. Proskauer is, therefore, working unofficially, separate from the Trustee, and I believe being paid by Tri-State Employment Service Inc. ("Tri-State") -- an entity that is also owned or controlled by Cassera.

18. I believe that Proskauer also represents Tri-State in connection with a similar litigation hold. As a result, at the Debtor's request, Proskauer (with assistance) has spent weeks "imaging" servers used by the Debtor (and related companies), as a result of the litigation hold.

5

19. Despite a request by the Trustee to see what Debtor material is being copied, to date, the request has not been honored.

20. Further, I understand that Carter Ledyard LLP ("Carter") has been conducting similar imaging activities for CRS. Thus, servers used by CRS have been, or are in the process of being imaged.

21. As noted above, CRS has been selling off its book of business and in some cases transferring employment records to purchasers. CRS has also reportedly sold the software system, Apex-Summit, used by the Debtor to process payroll checks and retain payroll information about its operations. That process is almost complete.

22. I understand that as CRS sells or otherwise transitions its customer agreement to third parties, documents that belong to, or which contain information about, the Debtor may be discarded or otherwise transferred without the Trustee's consent.

23. Based on my experience in other cases, when business wind down rapidly, records can be lost, disregarded or misplaced. Former employees can remove laptops or portable servers for various reasons. Where frauds have likely been committed, the risk of these types of events increases for individual "bargaining" purposes. Moreover, Cassera is no longer communicating with the Trustee and we believe other employees are not being forthright or cooperative.

24. Moreover, based upon my limited work to date, it appears that the Cassera businesses have been operated with little or no regard to corporate separateness. By way of example, despite no contractual privity, $1.7 billion of TSE funds have been sent to Tri-State bank accounts without any apparent corporate purpose, TSE does not have a separate lease for occupancy, or any computer

equipment, and there is no cost sharing agreement or similar documents for the allocation of millions of dollars in overhead including personnel.

25. To further protect against spoliation -- which is a real and immediate danger in this case due to the suspicious transactions and lack of protection of Debtor documents and data -- I believe that my professionals should be allowed to copy all servers used by the Debtor, Tri-State and CRS (as well as any back up tapes of those servers) regardless of whether data from other related companies resides on those servers or tapes.

26. Without the additional protection of a Trustee's copy "in hand," there remains a risk that important material will be compromised in some way. If that happens, no remedy at law could compensate the Trustee (or the Debtor's estate) for that loss.

27. As a result, it is critical that I ensure that all recoverable documents are safeguarded as promptly as possible to assist in my efforts to identify property of the Debtor's estate

*[Concluded on the following page]*

Pursuant to 28 U.S.C. § 1746, I declare under the penalty of perjury that the foregoing is true and correct.

Executed on March 26, 2015 in New York, New York

                                        /s/ James S. Feltman
                                        JAMES S. FELTMAN