UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------X
                                            :
In re:                                      :   Chapter 11
                                            :
                                            :   Case No. 15-10243 (MG)
TS EMPLOYMENT, INC.                         :
                                            :
                        Debtor.             :
                                            :
------------------------------------------------------------X

**DECLARATION OF IRWIN KOSSOFF IN SUPPORT OF OBJECTION
TO *EX PARTE* APPLICATION OF CHAPTER 11 TRUSTEE**

IRWIN KOSSOFF, declares under penalty of perjury:

1.     I am a partner at Kossoff & Kossoff LLP ("K&K"), a certified public accounting firm located in Goshen New York, and I make this declaration in response to the March 26, 2015 declaration of James S. Feltman, Chapter 11 Trustee, through which declaration I understand he sought injunctive relief against Tri-State Employment Services Inc. ("TSES"), TS Employment, Inc. (the "Debtor") and others. As detailed below, Mr. Feltman's declaration is erroneous in many respects.

2.     I am a certified public accountant and formed K & K, a small accounting firm, in 1984. Other than myself, K&K has 3 partners, 1 additional CPA, 2 junior accountants and 5 staff employees. K&K has approximately 2600 individual tax clients and approximately 260 business clients, including of corporations, partnerships and fiduciaries, including one prior client company with annual revenues of approximately $50-60 million (exclusive of the Debtor and related companies). During my early years in public accounting, I was employed at an accounting firm, N. Tannenbaum & Co., working on tax returns and other client matters, including the filings and financial statements for one public company, Hess Oil & Chemical

Corporation. I then worked in private industry for several years, serving as controller at several corporations, including at a subsidiary of Revlon Inc., and as an assistant budget manager for Revlon. I was also a member of the federal tax committee of the Westchester Society of CPAs.

3.      I have been the accountant for the Debtor since 2010 and the accountant for the other Tri-State companies (collectively, but exclusive of the Debtor, the "Tri-State Entities") since 1995.[1] K&K reviews and reconciles the books and records of the Debtor and the Tri-State Entities on a quarterly and annual basis. Among other services, K&K prepares the Debtor's and the Tri-State Entities' corporate tax returns, state unemployment forms, the form 941s which report the payroll tax withholdings to the Internal Revenue Service (the "IRS") and correspondence with federal, state and local taxing authorities regarding taxes.

4.      Each of the Tri-State Entities, except Carusso, is involved in the provision of Professional Employer Organization ("PEO") services to clients across the country. PEO services generally consist of payroll, benefits, worker's compensation, tax, and training services. Each of the Tri-State Entities has been formed for an express purpose which makes it easier to function and to manage the separate business requirements of individual states or types of clients. For example, Tri-State North Carolina provides services to clients predominantly in North Carolina and TSES provides PEO services to clients nationwide which are generally companies with cash on delivery payment arrangements.

5.      In the case of the Debtor, it provided PEO services exclusively to Corporate Resources Services Inc. ("CRS") and its wholly owned subsidiaries. The Debtor provided payroll services, health insurance and worker's compensation, and made tax payments for the approximate 30,000 temporary employees of CRS. The Debtor rendered mostly weekly and

---

[1] The Tri-State Entities consist of Tri-State Employment Service Inc., and its 8 active subsidiaries: TSES, Broadway PEO, STS Group, Tri-State SC, Tri-State North Carolina, Tri-Odyssey, TSE-PEO, and Carusso Staffing ("Carusso").

2

some daily invoices (for daily workers) to CRS to cover these costs together with a small administrative fee which, including interest expense on past due balances, totaled 0.78% of payroll in 2014.

      6.      Based upon my extensive knowledge of the books and records and tax filings of the Debtor and the Tri-State Entities, there is no basis for the Trustee's statement of the existence of a "massive fraud involving the Debtor," as alleged in ¶ 10 of his March 26, 2015 declaration (the "Feltman Declaration"). Based upon my knowledge of the books and records, the Tri-State Entities have not entered into any "suspicious or lopsided business transactions with the Debtor" (*see* Feltman Declaration at ¶ 10) and there are no missing or diverted assets as suggested by Mr. Feltman in his declaration and accompanying papers. In fact, the contrary is true. Every dollar spent and transferred by and among the Debtor and the Tri-State Entities can be accounted for. Contrary to the Trustee's sworn statements about "a massive fraud" based upon large sums of money transferred out of the Debtor, the net of all transfers, debits and credits, between the Debtor, on the one hand, and the Tri-State Entities, on the other hand, from January 2010 through January 31, 2015 results in a debt due from the Debtor to the Tri-State Entities of approximately $32 million. Therefore, the following statements of the Trustee, seemingly made without analysis or reference to any time periods, are meaningless without any detail or context: (i) the Debtor "paid Tri-State $84 million more than it received" (presumably from CRS) (*see* Feltman Declaration at ¶ 15); (ii) the Debtor "made more than $30 million in unexplained payments to a related company named 'Broadway PEO' for no discernable reason" (*see* Feltman Declaration at ¶ 15); or (iii) $1.7 billion was transferred from the Debtor to [Tri-State] (*see* Feltman Declaration at ¶ 24). Other than a vain attempt to support his baseless allegation of a "massive fraud", there appears to be no reason for the Trustee to have picked out only sums

3

flowing *out* of the Debtor when he had available to him on the same general ledger from which he obtained those transfers, all the monies flowing *into* the Debtor. The Trustee also had on the general ledger all the journal entries reflecting payments made on behalf of the Debtor by the Tri-State Entities and consolidating balances to TSES quarterly and annually. Since all transactions are recorded and reconciled in the books and records of the Debtor and there are quarterly and year-end consolidated balances, the Trustee could plainly see the net of all the transactions and determine that what he was saying presented an incomplete and misleading recitation of the actual facts.

7.  The Trustee has recently repeated his same baseless allegations in an April 15, 2015 filing, apparently without any further review of the books and records of the Debtor or inquiry to any employee or outside vendor with knowledge of the finances of the Debtor. (*See* Trustee's Ex Parte Application, Docket No. 93, April 16, 2015.) He now poses the question "where did that $100 million go?" (*Id.* p. 2) without the slightest recognition or acknowledgement that there may have been no $100 million in the first place, as is actually the case here. And, in what appears to me to be an entirely unprofessional manner for someone who advised me he had an accounting background, the Trustee concludes that "the Debtor may have filled the coffers of numerous Cassera-related companies." (*Id.* ¶ 16). In fact, I met with the Trustee at his request on April 7, 2015 together with Yolanda Trippiedi, the Debtor's Corporate Secretary, who among other things supervises the bookkeeping department of the Debtor. This was the perfect opportunity for the Trustee to resolve any suspicions he might have harbored. He made no effort to do so. Instead, at that meeting, the Trustee did not ask me a single question about back payroll tax liabilities, transfers from the Debtor to the Tri-State Entities, the inter-company and Debtor obligations, or any questions at all about the finances or financial

statements of the Debtor.[2]

8. Since it appears the Trustee is not providing to the Court an accurate or balanced account of the finances of the Debtor, I believe it is time to set the record straight directly with the Court.

9. The Debtor and the Tri-State Entities were cash strapped. In the ordinary course of business, every day funds were disbursed between the Debtor and the Tri-State Entities, wherever cash was required to fund operations. The inter-company and Debtor transfers were accurately recorded in the books and records of each company, which books and records were kept separately, and then reconciled quarterly and annually. As can be seen by a review of the books and records from 2010 forward, the Debtor owed monies to TSES for worker's compensation and medical insurance for the CRS employees. The Debtor also sometimes had cash available that was used by one of the Tri-State Entities for its own operations when not immediately needed by the Debtor. But, most often, the Debtor needed funds to pay payroll taxes, worker's compensation or other expenses, and the Tri-State Entities funded those costs. The net of all those transactions as at January 31, 2015 is the approximate $32 million net due from the Debtor to the Tri-State Entities.

10. On the day the Feltman Declaration was filed (and prior to its filing), the Debtor provided to the Trustee, at his request, the Debtor's January 2015 financial statements which reflected the $32 million debt due from the Debtor to the Tri-State Entities (including $28 million due to TSES). *See* Exhibit A attached financial statements/balance sheet, including long-term liabilities reflecting all inter-company obligations broken out by company on the Debtor's balance sheet at January 31, 2015 and accompanying email transmittal on March 26, 2015.

---

[2] The only subject matter raised by the Trustee at the meeting was about whether the payroll invoices rendered to CRS were accurate, which they were, as Ms. Trippiedi demonstrated to him by obtaining sample invoices and payroll runs for randomly selected dates and comparing the two.

5

11.     In addition to his selected cash figures going out of the Debtor, the Trustee also references as another one of his cited "questionable related-entity transactions" approximately $20 million in overhead allocations to the Debtor from the Tri-State Entities in 2012 and 2013. (*See* Feltman Declaration at ¶ 15.) As the Trustee himself has noted, the Debtor has no direct employees. The facilities and manpower to operate the Debtor are provided through Tri-State. All administrative expenses are shared by the Tri-State Entities and the Debtor, pro rated on the basis of each entity's total dollar amount of client payroll. As the Debtor's client payroll increased over the years after 2010, its pro rata share of the administrative expenses dropped from 1.8% of payroll in 2011 to 0.78% of payroll in 2014. For example, in 2013, total administrative costs for the Tri-State Entities' and the Debtor's operations was approximately $21 million. This sum consisted of approximately $12 million in manpower costs and approximately $8.5 million in overhead costs, such as rent, utilities and supplies. Although the Debtor's client payroll was over 50% of total payroll, the Debtor paid less than 50% of administrative costs, approximately $9 million. For a company with approximately $760 million in gross revenues in 2013, overhead costs of approximately $9 million does not suggest any impropriety and there was none. *See* Exhibit B, Schedule of Administrative Costs and Allocations.

12.     In addition to picking out numbers in isolation to deem "suspicious", the Trustee appears to have made no effort to understand how the payroll tax deficit arose before erroneously alleging it involved a "massive fraud". A simple review of the books of the Debtor make very clear what transpired here as all transactions are recorded in those books. Those books have been available to the Trustee at the Debtor's offices from the time of his appointment. Beginning in 2011, a cash deficit arose between the Debtor and CRS on account of CRS's

unpaid invoices. By the end of January 2015, that cash deficit was approximately $63 million.[3] Those are funds that the Debtor did not have available to it to make timely payroll tax payments.

13. In addition to this approximate $63 million shortfall in payments on invoices rendered by the Debtor to CRS, a further cash shortfall was created because the Debtor underestimated the costs of worker's compensation for the approximate 30,000 CRS employees. The Debtor had agreed to charge CRS a fixed fee on that basis which turned out to be substantially less than the Debtor was obligated to pay in actual costs for worker's compensation. In addition, the Debtor was obligated to pay collateral for the worker's compensation claims, which collateral was not charged to CRS at all. The shortfall between amounts charged to CRS and amounts for which the Debtor was obligated in worker's compensation costs and collateral totaled approximately $48.5 million and $56 million, respectively, between January 2012 and December 31, 2014. Thus, there was a total cash shortfall relating to the provision of worker's compensation of $104.5 million during that period.

14. As background, TSES held the worker's compensation insurance policy issued by Lumbermen's Underwriting Alliance ("Lumbermen's") which included coverage for CRS's 30,000 temporary employees serviced by the Debtor. Therefore, the Debtor owed to TSES the funds necessary to pay the premium and claims on behalf of the CRS employees, as well as collateral required to be maintained by Lumbermen's to cover the claims of those employees.[4] While the Debtor charged CRS a flat fee for worker's compensation based upon its estimate of cost, the Lumbermen's policy was not based on a flat fee. The policy provided for a payment of a percentage of standard insurance premium which was approximately 25% in 2014, plus 100%

---

[3] In 2012, there was an offset of approximately $14.1 million when the Debtor accepted stock in lieu of cash payment of invoices totaling approximately $14.1 million.

[4] I understand that a description of the policy and how it operated is contained in Lumbermen's March 2, 2015 filing. (Docket Nos. 39-40.)

7

of the states' taxes required to be paid by Lumbermen's on the gross premium which averaged another approximate 20% of standard policy premium. In addition, the Debtor was obligated to pay up to a maximum for each individual claim, which maximum was $1.25 million in the 2014 policy, and a required amount of collateral to be held as security for the claims which was 100% of current claims and a percentage of claims for development (*i.e.*, anticipated future increases in costs to current claims). Between January 2012 and December 31, 2014, CRS was charged $84 million for worker's compensation but the costs of and collateral for worker's compensation for CRS's temporary employees totaled approximately $188.5 million, leaving a cash shortfall of approximately $104.5 million. Thus, the Debtor had a large cash shortfall relating to the provision of worker's compensation, caused by its underestimation of what turned out to be the outsized costs of claims, as well as its obligation for large sums of required collateral. The Debtor's agreement with CRS with respect to CRS's payments for worker's compensation was insufficient to cover the actual obligations of the Debtor for worker's compensation, creating a further cash shortfall of the Debtor of $104.5 million.

15. In total, the approximately $63 million shortfall in payments from CRS to the Debtor on account of unpaid invoices and the approximate $104.5 million shortfall created by the delta between $84 million in the worker's compensation costs charged to CRS and the sums for which the Debtor was obligated for CRS's worker's compensation, which together total $167.5 million, is the cause of the Debtor's inability to make all payroll tax payments on a timely basis. In short, business stresses, not a "massive fraud", account for the delay by the Debtor in being able to fund some of its payroll tax payments.

16. The Trustee asserts, as his final alleged indication of a "massive fraud involving the Debtor", that the Debtor's tax obligations of as much as $100 million was "grossly

inconsistent with the Debtor's filed tax returns." (Feltman Declaration at ¶ 5). In his accompanying *ex parte* application, the Trustee specifies that he is referring to the difference between a payroll tax liability of $26 million allegedly reported in the Debtor's 2013 federal tax return and the February 2015 bankruptcy filing where it was reported to the Court that the Debtor's payroll tax liability while not finally calculated "could be as high as $100 million." (Ex Parte Application, March 26, 2015, Docket No. 60, p. 3.) In the first instance, it should be noted that **from 2010 when the Debtor began in business, it has paid approximately $391 million in federal payroll taxes, including approximately $133 million in 2014 alone.** Turning to the specific allegation of the Trustee, there was actually no $26 million in payroll tax liabilities reported in the Debtor's 2013 federal tax return. The payroll tax liabilities of the Debtor, which were $67 million for the year end 2013, had been transferred to the books of TSES, reported on TSES's 2013 tax returns, and then, in late 2014, those 2013 tax liabilities were transferred back to the Debtor. *See* Exhibit C, consisting of relevant pages from the 2013 tax returns of the Debtor and Tri-State.

        17.    The above tax liability transfers occurred for the following reasons. On May 21, 2013, the Debtor had transferred to TSES 30,472,676 shares of CRS stock. The stock transfer was made to reduce the Debtor's shareholdings in CRS so that the Debtor would not have to report equity earnings on investment in CRS, as required by the American Institute of Certified Public Accountants ("AICPA"), which the Debtor had to do in 2012 in the approximate amount of $185,000. For the transaction, an independent valuation prepared in March 2012 was used which valued the stock at .4622 per share (when it was trading at .55 a share) and a promissory note in the amount of $14,084,410.84 was issued by TSES to the debtor.[5] However, on the day

---

[5] This stock had previously been given to the Debtor by CRS in March and July of 2012 in reduction of approximately $14.1 million of the outstanding debit for unpaid invoices owed by CRS to the Debtor.

of the stock transfer in May 2013, CRS stock was trading at $1.65 per share so the value of the stock was substantially higher, closer to $50 million. By mid-November 2013, CRS stock was trading at $3.87 a share, making the more than 30 million shares transferred to TSES worth approximately $117,929,256. TSES intended to borrow against and/or to sell shares in 2014 and use the proceeds to pay all the Debtor's outstanding back payroll taxes. However, in 2014, CRS, which had retained a new accounting firm, Crowe Horwath, did not complete the CRS 2013 financial statements in time for CRS's usual filing in April 2014, and the financial statements were not completed and issued until September 2014. Meanwhile, the price of CRS stock declined to an average price of approximately $1.50 in September 2014. As a result, TSES did not sell the CRS stock and repay the Debtor's back payroll tax liabilities of $67 million, so that liability was transferred back to the Debtor's books and records in late 2014.[6] In addition to those outstanding payroll taxes, the Debtor, while paying $133 million in payroll taxes in 2014, had additional unpaid payroll tax liabilities of approximately $27 million at year end 2014 and another approximate $6 million in January 2015 prior to the bankruptcy filing, which I am informed occurred when Wells Fargo, CRS's lender, failed to provide available funds for that purpose. Accordingly, at the time of the bankruptcy, the Debtor's outstanding liabilities for back payroll taxes was approximately $100 million, as the Court was informed upon the bankruptcy filing. At that same time, the Debtor also owed to Tri-State a net of approximately $32 million. In addition, the Debtor had other outstanding debts of approximately $ 36.5 million, including approximately $9 million in overdrawn cash accounts and approximately $27 million in accounts payable. *See* Exhibit D, Financial Statement Balance Sheet at January 31, 2015 columns D and E. Together, the outstanding obligations of the Debtor total the approximate $167.5 million cash

---

[6] The reporting of the $67 million liability for back payroll taxes on the TSES 2013 tax return had no impact on TSES's revenues or expenses or its tax calculations.

shortfall suffered by the Debtor since 2012. In short, there is no missing or diverted $100 million or any missing or diverted monies at all.

18. In January 2015, shortly before the bankruptcy filing, I attended a meeting, together with counsel for the Debtor, with Ms. Catherine Rodriguez, the IRS revenue agent assigned to collection of the Debtor's payroll taxes. At that meeting, we discussed developing a repayment plan for the back 2013 and 2014 payroll taxes. We explained to Ms. Rodriguez the steps that would be taken both by the Debtor and by CRS which would make it possible to pay the back payroll taxes. For 2015, the Debtor had increased its gross margin to CRS by 5% and CRS was going to: 1) increase prices to its clients; 2) reduce overhead and 3) exit clients with bad worker's compensation insurance experiences to reduce the cost of worker's compensation.[7] Ms. Rodriguez was receptive to developing a payment plan and she recognized that the Debtor had previously paid all back payroll taxes when the Debtor previously fell behind in 2012. If Wells Fargo had not intervened and determined to shut down CRS, I believe a successful plan would have been developed, the back payroll taxes would have been paid for 2013 and 2014, and both CRS and the Debtor would have continued in business.

19. In sum, there has been no "fraud" committed here. There were business stresses at CRS which caused it to fall short on its obligations to pay the Debtor sums due, the worker's compensation costs owed by the Debtor were much higher than had been projected and were charged on too low a flat fee basis to CRS, and the costs of collateral for worker's compensation were not charged to CRS at all. Together these factors led the Debtor to have cash shortages and be unable to meet the payroll tax obligations in a timely fashion. Nonetheless, as set forth above,

---

[7] Throughout 2014, some of the business issues which were hindering profitability of the Debtor were being analyzed and addressed. In addition to gathering information concerning the Debtor's undercharging CRS for worker's compensation, the Debtor identified the CRS clients with the worst worker's compensation claims experience and also sent staff to certain CRS clients to provide safety and other training in order to reduce worker's compensation claims.

11

the Debtor paid approximately $391 in payroll taxes during its first 5 years in business and I believe would have been able to correct the errors which caused the shortfall and thus would have been able to pay the back taxes and current tax obligations. All transactions are reflected on the books and records of the Debtor from which the facts set forth in this declaration can easily be confirmed.

20. Pursuant to 28 U.S.C. 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on April 21, 2015 in Boynton Beach, Florida

_____
IRWIN KOSSOFF