**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re<br><br>TS EMPLOYMENT, INC.,<br><br>Debtor. | **FOR PUBLICATION**<br><br>Case No. 15-10243 (MG)<br>Chapter 11 |
| In re<br><br>CORPORATE RESOURCES SERVICES, INC., *et al.*,[1]<br><br>Debtors. | Case No. 15-12329 (MG)<br>Chapter 11<br><br>(Jointly Administered) |
| JAMES S. FELTMAN, not individually but solely as chapter 11 trustee for TS Employment, Inc., Corporate Resource Services, Inc., *et al.*,<br><br>Plaintiff,<br><br>v.<br><br>WELLS FARGO BANK, N.A., and WELLS FARGO FINANCIAL LEASING, INC.,<br><br>Defendants. | Adv. Pro. No. 17-1175<br><br>Adv. Pro. No. 17-1176 |

## MEMORANDUM OPINION AND ORDER AFTER TRIAL

---

[1] The debtors in these jointly administered chapter 11 cases are: (1) Corporate Resource Services, Inc., (2) Accountabilities, Inc., (3) Insurance Overload Services, Inc., (4) Integrated Consulting Group, Inc. (incorrectly identified by the Debtors as "Integrated Consulting Services, Inc."), (5) Corporate Resource Development Inc., (6) The CRS Group, Inc., (7) Diamond Staffing Services, Inc., and (8) TS Staffing Services, Inc.

*A P P E A R A N C E S:*

JENNER & BLOCK LLP
*Attorneys for Plaintiff*
919 Third Avenue
New York, NY 10022
By:    Vincent E. Lazar, Esq.
       Richard Levin, Esq.
       Carl N. Wedoff, Esq.


OTTERBOURG P.C.
*Attorneys for Defendants*
230 Park Avenue
New York, NY 10169
By:    Richard G. Haddad, Esq.
       John Bougiamas, Esq.

## TABLE OF CONTENTS

I.      **Introduction** .................................................................................................... 4

II.     **Procedural History** ........................................................................................ 5

III.    **Jurisdiction And Venue** ................................................................................ 6

IV.     **Findings of Fact** ............................................................................................ 6

    A.      Background ................................................................................................ 6

    B.      The CRS Receivables Financing Facility ................................................ 8

    C.      The June 2014 Amendments .................................................................... 9

    D.      The February 2015 Amendments ........................................................... 25

    E.      The Cash Management System and Payroll Overdraft .......................... 27

    F.      The Indemnification Agreement ............................................................ 29

    G.      Diligence Undertaken Prior to Making the Payroll Advance ................ 31

    H.      The TSE 2002 Account Charges ........................................................... 33

    I.      The Post-Petition Overdrafts ................................................................. 42

    J.      WFFL Lease Payments .......................................................................... 45

    K.      The Indemnification for Legal Fees ...................................................... 47

V.      **Legal Standards** .......................................................................................... 49

    A.      Constructive Fraudulent Transfer .......................................................... 49

    B.      New York Debtor and Creditor Law ...................................................... 50

    C.      Preference ............................................................................................... 51

VI.     **Discussion** ................................................................................................... 51

    A.      The Trustee is Entitled to Avoid and Recover the $4.1 Million in Fees Paid to Wells Fargo as Constructive Fraudulent Transfers ................................................. 51

    B.      The Payroll Overdraft Cannot Be Recovered as Constructive Fraudulent Transfers .... 61

    C.      Post-Petition Bank Charges Are Recoverable ....................................... 65

    D.      The Trustee Cannot Recover the WFFL Lease Payment ....................... 72

    E.      Order for Accounting of Reimbursed Legal Fees .................................. 76

VII.    **Conclusion** .................................................................................................. 82

**MARTIN GLENN**
**UNITED STATES BANKRUPTCY JUDGE**

## I.     INTRODUCTION

Plaintiff James S. Feltman is the chapter 11 trustee ("Trustee") for the bankruptcy estates of TS Employment, Inc. ("TSE"), Corporate Resource Services, Inc. ("CRS"), and CRS's subsidiaries—Accountabilities, Inc., Corporate Resource Development Inc., Diamond Staffing Services, Inc., Insurance Overload Services, Inc., Integrated Consulting Group, Inc., The CRS Group, Inc. and TS Staffing Services, Inc. (the "CRS Subsidiaries," together with CRS, the "CRS Debtors," and collectively with TSE, the "Debtors").

CRS was a publicly-traded holding company for various temporary staffing businesses. TSE was the professional employer organization ("PEO") for workers employed by those businesses. Robert Cassera owned the majority of CRS's stock and 100% of TSE's stock. Cassera also owned 100% of Tri-State Employment Service, Inc. ("Tri-State"). ("Joint Pre-Trial Order," ECF Doc. # 22 at 2.)

Wells Fargo, N.A. provided receivables financing to certain of the CRS Debtors, and cash management services to TSE, Tri-State and Tri-State subsidiaries. A Wells Fargo affiliate, Wells Fargo Financial Leasing, Inc. ("WFFL," together with Wells Fargo, N.A., "Wells Fargo"), leased copiers to certain of the CRS Debtors. (*Id.*)

In late January 2015, Wells Fargo learned that TSE had not paid more than $100 million in federal payroll taxes for workers supplied to CRS customers. On February 2, 2015, TSE filed a chapter 11 bankruptcy petition. The Court approved the appointment of Mr. Feltman as the chapter 11 trustee for TSE on February 27, 2015. The CRS Debtors, however, did not file bankruptcy petitions at that time, and instead sold or closed their businesses under the

4

supervision of CRS's chief restructuring officer.  Following the sale of the CRS Debtors'
businesses, CRS filed a chapter 11 bankruptcy petition on July 23, 2015.  (*Id.*)

The Trustee seeks recoveries from Wells Fargo based on claims arising from the
following five sets of transfers: (1) $4,100,000 in prepetition account monitoring, facility, and
amendment fees paid to Wells Fargo; (2) a $2,572,570.26 transfer to Wells Fargo on February 5,
2015 to satisfy an overdraft in a non-debtor affiliate's account; (3) $439,710.58 in post-petition
bank charges to TSE's accounts and paid by the CRS Debtors; (4) a $240,220.26 payment on
June 30, 2015 to pay off 17 copier leases; and (5) $1,702,037 in legal fees paid to Wells Fargo,
most of which related to advice concerning or defending against the foregoing claims.  (*Id.* at 2–
4.)

For the reasons explained below, the Court concludes that the Trustee is entitled to
recover a total of $4,539,710.58 so far, comprised of the following: $4.1 million in prepetition
account monitoring, facility, and amendment fees; $439,710.58 in post-petition bank charges.
Additionally, the Trustee is entitled to recover a portion of the $1,702,037 in legal fees, pending
settlement or a proper accounting; and pre-judgment interest in an amount still to be determined.
The Court concludes that Wells Fargo has prevailed with respect to the Trustee's claims to
recover the $2,572,570.26 transfer to Wells Fargo on February 5, 2015 for an overdraft; and the
$240,220.26 payment on June 30, 2015 to pay off 17 copier leases.

## II.    PROCEDURAL HISTORY

On October 2, 2017, the Trustee filed the complaint (the "Complaint," ECF Doc. # 1),
which contains twenty-three counts, seeking to recover the transfers in question based a variety
of legal theories under the Bankruptcy Code, including constructive fraudulent transfer,
preferential transfer, and violation of the automatic stay.  (Compl. at 100–101.)  The Complaint

5

also contains claims based on state law theories, including breach of contract and unjust

enrichment.  (*Id.*)  The Court conducted a trial on November 16, 2018 and heard closing

arguments on January 23, 2019.  During the trial, the focus of the parties' evidence and

arguments was on whether the CRS Debtors received reasonably equivalent value from the

subject transfers.

### III.   JURISDICTION AND VENUE

This Court has jurisdiction pursuant to 28 U.S.C. § 1334(b) because this is an adversary

proceeding arising in and related to the chapter 11 cases *In re TS Employment, Inc.*, Case No. 15-

10243, and *In re Corporate Resource Services, Inc. et al*, Case No. 15-12329.  Venue is proper

in this District pursuant to 28 U.S.C. § 1409(a).  The Complaint contains both "core" and

"related to" claims, but the parties consented to the entry of final orders and judgment by this

Court.  (Joint Pre-Trial Order at 4.)

This opinion sets forth the Court's findings of fact and conclusions of law pursuant

to Rule 52(a) and (c) of the Federal Rules of Civil Procedure, made applicable to adversary

proceedings in bankruptcy by Rule 7052 of the Federal Rules of Bankruptcy Procedure.  The

results in this case are fact-dependent.  Therefore, the Court provides extensive findings of fact,

detailed in several sections below with information arranged in chronological order.

### IV.   FINDINGS OF FACT
#### A.   Background

Plaintiff James S. Feltman is the chapter 11 trustee for the bankruptcy estates of the

Debtors.  (Joint Pre-Trial Order at 4–40 ("Stipulated Facts") ¶ 1.)

CRS was a publicly-traded Delaware corporation, with its principal place of business in

New York.  (*Id.* ¶ 3.)  The CRS Subsidiaries are 100%-owned subsidiaries of CRS.  (*Id.* ¶¶ 4–

10.)  The CRS Debtors were engaged in the temporary staffing business.  (*Id.* ¶¶ 15–16.)

Cassera directly or indirectly owned a majority of the issued and outstanding stock of CRS.  (*Id.*

¶ 15.)  TSE is a privately-held Florida corporation.  (*Id.* ¶ 2.)  Cassera owned 100% of TSE.  (*Id.*

¶ 2.)

Wells Fargo is a nationally chartered bank headquartered in San Francisco, California.

(*Id.* ¶ 11.)  Wells Fargo provided receivables financing to certain of the CRS Debtors, and cash

management services to TSE and another affiliate, Tri-State.  (*Id.* ¶¶ 23, 30–33.)  A Wells Fargo

subsidiary, WFFL, leased copiers to certain of the CRS Debtors.  (*Id.* ¶¶ 12, 201.)

Cassera founded Tri-State in 1993 as a temporary staffing company, which grew through

acquisitions over the next fifteen years.  (*Id.* ¶ 14.)  CRS was organized as a publicly-traded

company in 2010 and pursued a strategy of rapid expansion by acquiring staffing businesses

from Tri-State, Cassera and competitors.  (*Id.*  ¶ 15.)  By the end of 2013, CRS reported that the

CRS Debtors had 5,000 customers with whom they placed 150,000 temporary staff during 2013;

CRS earned revenue of $819 million in the process.  (*Id.* ¶ 16.).

Cassera incorporated TSE so that it could act as the PEO for the CRS Debtors' staffing

businesses.  (*Id.* ¶ 17.)  The CRS Debtors were TSE's only customers.  (*Id.* ¶ 18.)  TSE provided

PEO services to CRS pursuant to an agreement under which TSE was the co-employer of record

for temporary and seasonal workers sourced by the CRS Debtors for their customers.  TSE was

responsible for the payment of temporary workers' wages and payroll, remittance of

withholdings, payment of employer taxes, risk-management underwriting, and payment of

workers' compensation insurance and expenses.  (*Id.* ¶ 19.)  TSE had no employees.

Substantially all of TSE's business, accounting, and other corporate functions were performed by

Cassera-affiliated entities and their employees and agents.  (*Id.* ¶ 20.)

7

B.        **The CRS Receivables Financing Facility**

In 2010, Wells Fargo exited a pre-existing receivables financing arrangement with Tri-State and established a receivables financing arrangement with CRS and its subsidiaries. (Stipulated Facts ¶ 30.)  With two exceptions not relevant to this litigation, the CRS Subsidiaries then in existence began entering into Account Purchase Agreements (each an "APA" and collectively, the "APA Facility") with Wells Fargo.  The terms of each of the APAs were substantially similar.  (*Id.* ¶ 9.)

The receivables financing facility generally operated as follows: Wells Fargo lent funds to the CRS Subsidiaries based upon an advance rate against eligible customer receivables and in return received an assignment of the CRS Subsidiaries' customer accounts receivables.  Wells Fargo also took a security interest in substantially all of the CRS Subsidiaries' assets.  The CRS Subsidiaries' customer payments were sent to a Wells Fargo lockbox, with receipts applied daily against the outstanding loans.  Wells Fargo advanced funds to the CRS Subsidiaries, typically on a daily basis based upon eligible customer receivables and other factors.  As part of this arrangement, Wells Fargo processed and accounted for receipts of CRS Subsidiary customer receivables.  (*Id.* ¶ 32.)

CRS guaranteed its subsidiaries' APA obligations to Wells Fargo.  (*Id.* ¶ 34.)  Wells Fargo also received cross-guarantees from the CRS Subsidiaries of each other's obligations under the APA Facility.  (*Id.* ¶ 35.)

The financing facility initially had a three-year term ending August 27, 2013, and thereafter renewed each subsequent 24-month period unless a party provided at least 60 days' notice prior to the end of the current term.  (*Id.* ¶ 39.)  The APA Facility was amended on numerous occasions.  (*Id.* ¶¶ 42, 45, 48, 52, 60, 64, 68, 74, 79, 83, 89, 95.)

8

In August 2013, the APA Facility was amended to extend the term of the financing facility for four months, to December 31, 2013, instead of the two-year extension period originally contemplated. (*Id.* ¶ 53.) In December 2013, the term of the financing facility was extended for one additional month, to January 31, 2014. (*Id.* ¶ 61.) On January 31, 2014, the term of the financing facility was extended for only ten days, to February 10, 2014. (Trial Ex. 11.) Under the January 31, 2014 amendments, the financing facility also became terminable by either Wells Fargo or the CRS Subsidiaries on 30 days' notice. (Stipulated Facts ¶ 65; Trial Ex. 11.) The January 31, 2014 amendments prohibited the payment of certain affiliate indebtedness, including $15 million of CRS Debtor indebtedness to TSE, required the CRS Debtors to hire a financial consultant, and limited the purposes for which proceeds of the financing facility could be used. (*Id.*) On February 10, 2014, the APA Facility was amended to extend the term of the financing facility for roughly three and a half months, to June 30, 2014. (Stipulated Facts ¶ 69; Trial Ex. 12.) There was no change in the 30-day termination provision that had been added ten days earlier by the January 31, 2014 amendments. (*Id.*)

### C.   The June 2014 Amendments

On or about March 10, 2014, Wells Fargo provided formal notice to the CRS Debtors that the financing facility would not be renewed and would be terminated effective July 1, 2014. (Stipulated Facts ¶ 70.) Thereafter, Wells Fargo learned that CRS's auditor would be issuing an audit opinion with a going-concern qualification unless replacement financing was secured by the CRS Subsidiaries. (*Id.* ¶ 71.)

On June 20, 2014, Wells Fargo rescinded its March 10, 2014 non-renewal notice. (*Id.* ¶ 73.) On that same day, the CRS Debtors and Wells Fargo entered into another set of amendments to the APA Facility. (*Id.* ¶ 74.)

9

Alexander Chobot, a senior vice-president at Wells Fargo, was Wells Fargo's sole witness at trial. Chobot testified that changes to a loan facility's structure and terms customarily required an internal "Credit Modification Request" prepared and approved by Wells Fargo personnel. ("Trial Transcript," ECF Doc. # 27 at 96:19–97:55.) Chobot testified that an internal Credit Modification Request was prepared in connection with the June 2014 amendments and approved by a number of Wells Fargo personnel in the Wells Fargo Commercial Services and Credit divisions. (Trial Ex. 74; Trial Tr. at 97:13–103:16.)

Chobot acknowledged, consistent with his declaration, that he was not involved in Wells Fargo's relationship with the Debtors prior to November 2014. (Trial Tr. at 89:3–15; the "Chobot Declaration," Trial Materials 4, ¶ 3.) Chobot testified that any information predating the mid-November 2014 period was based on his discussions with other people, documents in Wells Fargo's credit file and Well Fargo's legal files. (Trial Tr. at 89:9–10.)

Commercial Services Division approvals for the June 2014 amendments were obtained from Beverly Ferrara, the Relationship Manager for the CRS Debtors' loan facility; Gerard Gabriele, a Senior Relationship Manager; Jason Cole, the Regional Manager of the Commercial Services Division; David Ciccolo, Head of the Specialty Services Division; Stuart Brister, Head of Commercial Services; and James Dore, Head of Commercial and Retail Finance. (Trial Tr. at 97:13–103:17; Trial Ex. 74 at WF_TS_0034366–0034387.)

Credit Division approvals for the June 2014 amendments were obtained from Anthony Montemarano, a Wells Fargo Commercial Finance Division Credit Officer; his manager, Frank O'Connor, a Wells Fargo Commercial Finance Division Senior Credit Officer; and Kevin Coyle, the Chief Credit Officer for the Wells Fargo Commercial Finance Division. (Trial Ex. 74.)

10

Ferrara, Ciccolo, Brister, Dore, Montemarano, and O'Connor all currently work for Wells

Fargo, and Ferrara's and Montemarano's depositions were taken during discovery. (*Id.*) Wells

Fargo did not submit any declarations from Ferrara, Ciccolo, Brister, Dore, Montemarano, or

O'Connor in its case in chief, nor did it call any of them as rebuttal witnesses. Instead, Wells

Fargo relied solely on the declaration and testimony of Chobot, who as noted above was not

involved in the June 2014 decision-making process or the negotiation of those amendments.

Chobot relied solely on statements made by third parties and his review of documents in the files

in connection with his testimony about the June 2014 amendments.

The June 20, 2014 amendments to the APA Facility, among other things:

(a) extended the term of the financing facility to July 1, 2015;

(b) added a July 31, 2015 replacement financing milestone, which if unmet constituted an

event of default;

(c) provided for the payment of a $200,000 amendment fee;

(d) provided for the payment of a facility fee equal to .25% of the financing

facility maximum; and

(e) established a monitoring fee of $400,000 per month beginning in August 2014, which

was originally set to increase by $100,000 each month thereafter, subject to reduction in

the event that a replacement financing commitment letter was delivered by August 31,

2014.

(Stipulated Facts ¶ 75.)

From June 2014 through January 2015, Wells Fargo assessed $3.6 million in facility fees,

monitoring fees and amendment fees pursuant to the June 2014 amendments to the APA Facility.

(*Id.* ¶ 92.) The facility fees, amendment fees and monitoring fees were charged against the

financing facility and paid by the CRS Debtors.  (*Id.* ¶ 93.)  Prior to June 2014, no amendment fees, monitoring fees or facility fees were ever charged in connection with the CRS Subsidiaries' financing facility or any amendments thereto.  (*Id.* ¶¶ 40, 41, 43, 46, 50, 55, 61, 66, 69.)

The parties have stipulated that at all times relevant to the claims asserted in the Complaint, the CRS Debtors were engaged in business for which their property was unreasonably small capital.  (Trial Tr. at 7:3–11.)  In addition, the Trustee provided testimony by way of declaration concerning the CRS Debtors' undercapitalization and insolvency.  ("Feltman Declaration," Trial Materials 2, ¶¶ 81–110.)

Chobot asserted in his declaration that the fees charged under the June 2014 amendments compensated Wells Fargo for the additional risk and internal costs that Wells Fargo incurred.  (Chobot Decl. ¶¶ 9, 28.)  Chobot further asserted in his declaration that after June 2014, Wells Fargo was advancing substantial money in a "risky environment," and that in return for Wells Fargo's commitment to continue financing, CRS received "new high-risk advances" of over $1 billion.  (*Id.* ¶¶ 10–11.)  As noted above, Chobot acknowledged that he was not involved with the credit facility at the time of the June 2014 amendments, and Wells Fargo submitted no testimony from any personnel involved in the June 2014 amendments.  The documents that were admitted into evidence do not support the assertion that Wells Fargo perceived the credit facility to be a "high risk," and instead show that the fees were punitive in nature and designed to drive CRS from the bank.

Wells Fargo used an internal account rating, or "IAR," to rate its borrowers.  The parties stipulated that Wells Fargo's IAR system in use at the time rated its borrowers on a scale of one to six, with six being the riskiest rating.  (Stipulated Facts ¶ 44.)  The CRS Debtors maintained a relatively constant IAR at Wells Fargo; from 2011 through May 2014, the CRS Debtors were

assigned an IAR of "3" by Wells Fargo. (*Id.* ¶¶ 44, 47, 51, 56, 58, 62, 67.) Chobot testified that a "3" rating was "about average" for an asset-based loan. (Trial Tr. at 111:7–12.)

Beginning sometime in 2013, Wells Fargo began using an additional rating system for the CRS loan facility, a "BQR/CQR/AQR" or "Risk Rating" system. (Stipulated Facts ¶ 59.) "BQR" stands for "Borrower Quality Rating," which measures the risk of a borrower default; "CQR" stands for "Collateral Quality Rating," which measures the risk of loss if a borrower defaults; and "AQR" stands for "Asset Quality Rating," and is calculated based on some combination of the BQR and CQR rating. (*Id.*) The parties stipulated that each of these ratings was calculated on a scale of one to nine, with nine being the riskiest rating. (*Id.*) As of November 2013, the CRS receivables financing facility was assigned a Risk Rating of "7/5/7+." (Stipulated Facts ¶ 59.) By the time of the January 2014 amendment to the financing facility, both the BQR Risk Rating and the composite AQR Rating had improved to "6/5/6+." (*Id.* ¶ 67.)

In May 2014, Wells Fargo assigned the CRS Debtors an IAR of "3-." (*Id.* ¶ 72.) The reason for the "3-" rating was CRS's failure to timely provide annual audited financial statements and file its SEC Form 10K. (Trial Ex. 79 at WF_TS_0121892.) The financing facility continued to be assigned a Risk Rating of "6/5/6+." (Stipulated Facts ¶ 72.) At the time of the June 20, 2014 amendments, the CRS Debtors continued to be assigned an IAR of "3-" by Wells Fargo, and the financing facility continued to be assigned a Risk Rating of "6/5/6+." (*Id.* ¶ 77.)

On September 30, 2014, Terry Rothe, a Credit Portfolio Manager at Wells Fargo, emailed Ferrara, Gabriele and others in response to an email from Lloyd Havel in Wells Fargo's Staffing Services Group. (Trial Ex. 26 at WF_TS_0121835.) In that email, Rothe indicated that he was "struggling calling this a BQR 65 or BQR 75" (the BQR scale had been changed from a 1-9 scale

13

to a 10-90 scale).  (Trial Ex. 26 at WF_TS_0121833–0121834.)  In the same email, Rothe

provided several reasons why CRS's BQR rating should be higher.  (*Id.*)  Havel, Ferrara, and

Gabriele ultimately concluded that they nonetheless should give CRS's facility a BQR rating of

65 even though "the qualitative metrics point to a higher rating."  (Trial Ex. 26 at

WF_TS_0121830.)

As of October 16, 2014, the CRS Debtors continued to be assigned an IAR of "3-" by

Wells Fargo.  (Stipulated Facts ¶ 82.)  The financing facility was assigned a Risk Rating of

"65/3/5," and the composite AQR Rating had improved to a "5."  (*Id.*)  At the time of the

December 3, 2014 amendment, the CRS Debtors continued to be assigned an IAR of "3-" by

Wells Fargo, but the CRS Debtors were downgraded to a "4" later that month because CRS was

on "exit status" and had not provided the commitment for replacement financing required by

Wells Fargo.  (Stipulated Facts ¶ 91; Trial Ex. 82.)  The financing facility continued to be

assigned a Risk Rating of "65/3/5."  (Stipulated Facts ¶ 91.)  Thus, Wells Fargo's own internal

Risk Ratings reflect that the quality of its collateral and the credit improved throughout 2014,

and the primary reason the IAR was assigned a rating lower than a "3" was CRS's failure to meet

a condition imposed by Wells Fargo that the CRS Debtors leave the bank.

In his declaration, Chobot testified that Wells Fargo's collateral position was becoming

tighter during 2014.  (Chobot Decl. ¶ 22.)  At trial, Chobot elaborated that Wells Fargo's

collateral position was becoming tighter because CRS was using some of its working capital for

acquisitions instead of payroll and general operating expenses (Trial Tr. at 109:13-17), and that

such a use could "potentially" manifest itself in the collateral position.  (*Id.* at 109:22–25.)

However, on cross-examination Chobot conceded that Wells Fargo's collateral position

improved throughout 2013 and 2014.  (*Id.* at 127:15–19.)

14

The October 1, 2012 amendments to the APA Facility provided that Wells Fargo could establish a reserve with respect to the "Available Amount" (*i.e.,* an availability block). (Stipulated Facts ¶ 49.)  For purposes relevant to this litigation, an availability block reduces the maximum amount that can be borrowed, even if otherwise acceptable accounts have been assigned to the bank.  (*Id.*)  However, no availability block was established in 2012.  The August 2013 amendments established the first availability block, a $2.0 million availability block which did not automatically increase.  (*Id.* ¶ 53.)  The January 2014 amendments further increased the availability block to $2.5 million, and the availability block automatically increased thereafter by either $250,000 or $500,000 each month beginning in March 2014.  (*Id.* ¶ 65; Trial Ex. 11.)

In his declaration, Chobot testified that the purpose of the increases in the availability block beginning in January 2014 was to give CRS a buffer for liquidity purposes and avoid a cash crisis in the event CRS's financial condition worsened.  (Chobot Decl. ¶ 20.)  He similarly testified that the purpose of the June 2014 availability block was to assure CRS and Wells Fargo that there would be adequate funds available in the event of an unanticipated liquidity shortfall where the block (reserve) could be used to fund critical expenses such as payroll, and that the availability block would give CRS time to resolve the issue or make adjustments to its cost structure without causing a disruption of its business.  (*Id.* ¶ 31.)

On cross-examination, Chobot reiterated that the reason for the ever-increasing availability block was that there would be a liquidity buffer in the event of a cash crisis.  (Trial Tr. at 95:2–6.)  Chobot was not involved in Wells Fargo discussions or the deliberative process with respect to either the January 2014 or June 2014 availability blocks.  (*Id.* at 89:3–10.)  When the Court asked Chobot who at Wells Fargo made the decision to impose the availability block, Chobot testified that he did not know, and that it was before his time.  (*Id.* at 95:20–25.)

15

Despite their availability, Wells Fargo submitted no testimony from any of the witnesses involved in the decision-making process with respect to the 2014 availability blocks, and the only document discussing the reason for the availability block paints a very different picture from Chobot's testimony.  (Plaintiff's Proposed Findings ¶ 57, ECF Doc. # 29.)

The Credit Modification Request pertaining to the June 2014 amendments and the approvals attached thereto are the only documents describing why the ever-increasing availability block was imposed.  (*Id.* at 107:9–12.)  That Credit Modification Request made no mention of a liquidity buffer in the event of a cash crisis.  To the contrary, as conceded by Chobot on cross-examination, the email from Wells Fargo's top credit officer (Coyle, the Chief Credit Officer) attached to the Credit Modification Request for the June 2014 amendments indicated that "[I]t appears that we're providing a contract extension through 6/30/15 so that the company can release its financial statements and 10-K.  However, the actual intent is to incentivize the client to line up replacement financing ASAP, as evidenced by the step-up in the monthly increases to the Availability Block."  (*Id.* at 103:18–104:9; Trial Ex. 74 at WF_TS_0034371.)  Montemarano responded with an email confirming Coyle's understanding: "You are reading the situation correctly.  I don't think there is a need for another follow-up call." (Trial Ex. 74 at WF_TS_0034370.)  Even though they were available, neither Montemarano nor Coyle were called to testify by Wells Fargo.  Thus, the only evidence from decision-makers on this issue shows that the purpose of the account block was to drive the CRS Debtors from Wells Fargo.

Wells Fargo also internally reported an "effective advance rate" for the loan facility. Chobot explained that the effective advance rate measures the loan balance in comparison to the total accounts receivable pledged to Wells Fargo.  (Trial Tr. at 116:8–15; 124:17-22.)  The

16

availability block continued to increase throughout 2014, and by December 3, 2014 had

increased to $10.75 million. (Trial Ex. 83 at WF_TS_0017828.) Because the availability block

increased each month, the effective advance rate (or, in other words, Wells Fargo's collateral

cushion) materially improved throughout 2014 and early 2015.

Wells Fargo's business records reflect this improvement; the effective advance rate of

85% of eligible accounts receivable as of May 5, 2014 (Trial Ex. 74 at WF_TS_0034357) was

reduced to an effective advance rate of 80% of eligible accounts receivable (71% of gross) as of

October 16, 2014 (Trial Ex. 79 at WF_TS_121892); then to an effective advance rate of 76% of

eligible accounts receivable (73% of gross) as of January 12, 2015 (Trial Ex. 83 at

WF_TS_0017828); and eventually to an effective advance rate of only 68% of eligible (and 65%

of gross) accounts receivable by January 31, 2015. (Trial Ex. 84 at WF_TS_00006724.) During

cross-examination concerning (among other things) the improving accounts receivable collection

rates and Wells Fargo's increasing collateral cushion, Chobot conceded that Wells Fargo's

collateral position actually improved during 2014. (Trial Tr. at 127:15-19.)

Wells Fargo also internally reported a "dilution rate" for the financing facility. At trial,

Chobot explained that the net dilution rate represented the percentage of receivables pledged to

Wells Fargo that were not collected. (*Id.* at 114:16–115:9.) As of November 2013, the net

dilution rate for the CRS Subsidiaries' accounts receivable that had been pledged to Wells Fargo

was 1%. (Trial Ex. 71 at WF_TS_00117972-73.) The accounts receivable base was considered

by Wells Fargo to be "strong." (*Id.* at WF_TS_0017971.) After November 2013, the net

dilution rate did not deteriorate, and in fact improved throughout 2014. Wells Fargo's business

records reflect a 0.8% net dilution rate as of May 5, 2014 (Trial Ex. 74 at WF_TS_0034357); a

0.5% net dilution rate as of October 16, 2014 (Trial Ex. 79 at WF_TS_121892); and a 0.5% net

dilution rate as of December 3, 2014. (Trial Ex. 81 at WF_TS_17719-20.) This means that

99.5% of the CRS Debtors' accounts receivable were being collected as of December 2014.

Chobot asserted in his declaration that the Wells Fargo fee structure was cheaper than

what was available on the market. (Chobot Decl. ¶¶ 34–35.) Chobot based this testimony upon

proposals received from potential take-out lenders. (*Id.*)

Chobot testified in both his declaration and at trial that the fees in a CIT proposal, and the

fees in proposals from four other potential lenders (Salus Capital Partners, Callidus

Capital, White Oak and Gordon Brothers), were more expensive than the fees charged by

Wells Fargo under the financing facility. (*Id.* ¶¶ 33–35; Trial Tr. at 190:19–196:9.) However,

all of these proposals significantly post-dated the June 2014 amendments, with the CIT proposal

being made in September 2014 and the other four proposals dating between December 2014 and

January 2015. (Chobot Decl. ¶¶ 33–34; Trial Exs. 86–90.) Indeed, the earliest document in

evidence showing the terms of any alternative proposal is an August 25, 2014 presentation by

CRS's financial advisor, made nearly two months after the June 2014 amendments. (Trial Ex.

85.)

Montemarano testified during his deposition that at the time of the June 2014

amendments, he understood that CRS had alternative financing proposals that were more

expensive than the financing provided by Wells Fargo. ("Montemarano Deposition Transcript,"

Trial Materials 6 at 82:12–83:20.) However, when further questioned, Montemarano conceded

that his "timing may be a little off" and that "at certain points" CRS had what he considered to

be actionable financing proposals from other lenders. (*Id.* at 84:2–10.) Montemarano also did

not recall reviewing any commitment letters from third parties and believed that he likely had

18

received verbal reports summarizing the proposals.  (*Id.* at 85:2–15.)  As noted above, Montemarano did not submit a declaration or testify at trial.

Neither the Credit Modification Request pertaining to the June 2014 amendments, nor any other document submitted by Wells Fargo at trial, shows that Wells Fargo considered the cost of financing proposals from third parties in making its determination to charge the amendment, facility and monitoring fees provided for in the June 2014 amendments.

At his deposition, Chobot also claimed that through the rate and fee structure, Wells Fargo intended to "acclimate" CRS to the higher market fees CRS would be paying.  ("Chobot Deposition Transcript," Trial Materials 5, at 104:11–105:11.)  Chobot, who as noted above was not involved in the June 2014 decision-making process, testified that the basis for his claim was discussions with other Wells Fargo personnel.  (*Id.* at 105:12–22.)  None of those persons submitted a declaration or were called to testify to that effect, and no documents support the assertion that Wells Fargo intended to acclimate CRS to the market.  In sum, Wells Fargo presented no credible evidence that it considered, or even had access to, information about relevant market rates and fees at the time of the June 2014 amendments.

In his declaration, Chobot asserted that the fees imposed by the June 2014 amendments also were intended to compensate Wells Fargo for additional monitoring and other costs it was incurring.  (Chobot Decl. ¶¶ 9, 26–27.)  However, Wells Fargo's contemporaneous internal documents reflect that the fees charged under the June 2014 amendments were not designed to compensate Wells Fargo for any actual costs, but rather were intended to force the CRS Debtors to leave Wells Fargo and find a new lender.  (Plaintiff's Proposed Findings ¶ 31.)  That is particularly the case with the $3.2 million in monitoring fees charged to the CRS Debtors.  Wells Fargo had no guidelines concerning what fees would be charged under what circumstances.

("Ferrara Deposition Transcript," Trial Materials 7 at 22:22–23:12.)  Under the June 2014

amendments, a monitoring fee was established, which escalated by $100,000 each month that

CRS remained a Wells Fargo customer; this fee bore no relation to any actual costs or expenses

borne by Wells Fargo.  (Feltman Decl. ¶ 178.)

At his deposition, Chobot testified as Wells Fargo's Rule 30(b)(6) witness, and justified

the ever-increasing account monitoring fee by explaining that additional Wells Fargo personnel

were involved in monitoring the loan after June 2014.  (Chobot Dep. Tr. at 101:17–24.)

However, Chobot could not name any of the additional personnel (*id.* at 101:25–102:3), did not

know how many additional people were involved (*id.* at 102:17–20), and did not know whether

any internal costs were allocated for those personnel.  (*Id.* at 102:4–10.)  In his declaration,

Chobot repeated his assertion that additional Wells Fargo staff were needed to confirm the daily

collateral position, follow up with CRS's staff on delinquent receivables, independently verify

receivables, and review CRS's cash flow budget prepared by its consultant.  (Chobot Decl. ¶ 26.)

However, the trial evidence, discussed below, did not support this assertion.

The Credit Modification Request pertaining to the June 2014 amendments and related

approvals did not mention increased monitoring costs or other expenses.  (Trial Ex. 74.)  Instead,

those documents show that in connection with the June 2014 amendments, the CRS Debtors had

requested that Wells Fargo delay imposition of the monitoring fee until September 1, 2014,

subject to providing a commitment letter for take-out financing.  (*Id.* at WF_TS_0034382.)  The

bank officer communicating CRS's request to his colleagues (Gabriele) indicated that he was

"supportive of this request as it is our intention to give the company incentive to leave, the fee

income is secondary to our primary goal."  (*Id.*)  Gabriele continued: "If the company does not

provide a commitment letter by 7/31, we could create an event of default and charge the fee on 8/1, as originally approved." (*Id.*)

Although the CRS Debtors' request to defer the monitoring fee was not approved (Trial Tr. at 106:9-24), the Credit Modification Request approvals demonstrate that the purpose of the monitoring fee was to incentivize CRS to leave and had nothing to do with actual costs incurred by Wells Fargo. This is self-evident from the nature of the ever-escalating monitoring fee, which was unchecked by any event other than the CRS Debtors providing an exit financing commitment.

Wells Fargo's internal documents also reflect that there was little concern about monitoring the quality of the receivables pledged to Wells Fargo, which as noted above were being collected at a 99%+ rate. As part of its receivables collection process, Wells Fargo verified the existence and validity of a sampling of the CRS Subsidiaries' accounts receivable that were pledged to Wells Fargo as collateral. (Tr. Trial at 113:12–16.) In 2012 and early 2013, the accounts receivable pledged to Wells Fargo as collateral were being verified by Wells Fargo at a standard 10% verification level for accounts of this type. (Trial Ex. 69 at WF_TS_24038; Trial Ex. 70 at WF_TS_18402.) By November of 2013, Wells Fargo was only verifying 5% of the CRS Subsidiaries' accounts receivable pledged to Wells Fargo as collateral. (Trial Ex. 72 at WF_TS_0122765; Trial Ex. 73 at WF_TS_0024252.) As of the time of the June 2014 amendments, Wells Fargo was still only verifying 5% of the CRS Subsidiaries' accounts receivable pledged to Wells Fargo as collateral. (Trial Tr. at 113:6–11; Trial Ex. 74 at WF_TS_0034357). Chobot explained at trial that the verification level for the CRS Subsidiaries' accounts was an "exception" at 5%, and that the 5% level was lower than the normal verification level. (Trial Tr. at 113:10–114:7.)

21

Wells Fargo's account verification activity did not materially increase after the June 2014 amendments and remained below the "standard" 10% level until TSE's non-payment of taxes was discovered in January 2015.  (Trial Ex. 79 at WF_TS_121892 (reflecting a 5.8% verification level as of October 16, 2014); Trial Ex. 81 at WF_TS_17719-20 (reflecting a 7.7% verification level of 5.1% of outstanding and 7.7% of paid accounts receivable as of December 3,2014); Trial Ex. 83 at WF_TS_0017828 (reflecting a verification level of 5.2% of outstanding and 9.7% of paid accounts receivable as of January 12, 2015).)

The only meaningful additional monitoring or reporting reflected in Wells Fargo's records was a monthly, one-or-two-page Watchlist or Problem Loan report prepared by Ferrara. (*See* Trial Exs. 75, 76, 79, 82–84.)  Wells Fargo provided no testimony concerning the costs of preparing that report, or how Wells Fargo's costs might ever begin to approach the escalating monitoring fees that were being charged pursuant to the June 2014 amendments.

As noted above, when Chobot testified as Wells Fargo's Rule 30(b)(6) witness, he was unable to provide any details regarding Wells Fargo's increased monitoring costs.  He also conceded that he was not involved in the establishment of the account monitoring and other fees provided for in the June 2014 amendments.  (Trial Tr. at 89:3–15; Chobot Decl. ¶ 3.)  On cross-examination, Chobot testified that since the date of his deposition, he had not spoken with anyone concerning whether additional staff were needed to monitor the account, and that he had not reviewed any documents since his deposition reflecting additional staff needed for monitoring.  (Trial Tr. at 131:18–19.)  Finally, when questioned directly by the Court, Chobot essentially conceded that there was no increased monitoring of Wells Fargo's collateral during 2014.  (*Id.* at 128:25–129:21.)

22

In his declaration, Chobot also asserted that Wells Fargo's costs of funds increased because Wells Fargo had to increase its reserve allocations in order to carry the higher risk CRS loan in 2014. (Chobot Decl. ¶¶ 27–28.) When questioned about this on cross-examination, Chobot acknowledged that while the portfolio group's cost of funds increased, that was purely an internal allocation within Wells Fargo. (Trial Tr. at 132:1–4, 22–23.) Chobot could not quantify, and did not have any information concerning, the extent to which any reserve was taken as a result of the CRS Debtors' loan in 2014, or the costs of that reserve. (*Id.* at 132:6–21.)

Wells Fargo presented no evidence or documents reflecting any actual increase in Wells Fargo's costs of funds during 2014. Moreover, as described above, Wells Fargo's Risk Ratings for the CRS credit facility improved during 2014, and Chobot was not able to testify about any supposed reserve increases. Wells Fargo thus failed to demonstrate any increase in its reserves to carry a higher risk loan in 2014 (or indeed that it was even a higher-risk loan). It also failed to demonstrate what the costs might have been if it had demonstrated an increase in its reserves.

Chobot asserted in his declaration that Wells Fargo provided more than $1 billion of new financing to CRS in the year preceding CRS's bankruptcy. (Chobot Decl. ¶ 8(a).) However, that statement does not accurately reflect the nature of the parties' relationship. Wells Fargo did not extend $1 billion of new credit to the CRS Debtors. Rather, because of the revolving nature of the receivables financing facility, old receivables were simply replaced with new receivables. (Stipulated Facts ¶ 12.) Although the CRS loan balance did modestly increase during 2014, as described above, Wells Fargo also imposed an ever-increasing account block beginning in January 2014, and as a result, CRS's availability under the receivables financing facility was reduced by more than $10 million during 2014. In reality, Wells Fargo was reducing its

exposure throughout 2014, taking additional collateral and leaving CRS with no working capital. (Feltman Decl. ¶ 176.)

Chobot claimed at his deposition that the bank had committed itself to a 12-month extension of the loan. (Chobot Dep. Tr. 107:9–108:7.) However, he acknowledged that the loan was terminable on 30 days' notice (*id.* at 107:9–13), and also was terminable based upon any number of potential defaults. (*Id.* at 108:4–7.) Under the June 2014 amendments to the receivables financing facility, the CRS Debtors' failure to provide a commitment letter for a replacement financing facility by July 31, 2014 (one month later) constituted a termination event. (Trial Ex. 13 at 7; Feltman Decl. ¶ 175.) The receivables financing facility also continued to be terminable on 30 days' notice even if there was no default. (Trial Ex. 74 at WS_TS_0034355.)

On August 5, 2014, the APA Facility was amended to extend the replacement financing deadline by two months, to October 15, 2014. (Stipulated Facts ¶ 80; Trial Ex. 15.) Failure to meet the replacement financing deadline again constituted an immediate event of default. (Trial Ex. 15.) On November 4, 2014, the replacement financing deadline was extended to November 30, 2014. (Stipulated Facts ¶ 84; Trial Ex. 17.)

On December 3, 2014, the replacement financing deadlines were again amended to require the submission of a replacement financing proposal letter acceptable to Wells Fargo by December 19, 2014; a commitment letter acceptable to Wells Fargo by January 15, 2015; and payment of all obligations by January 31, 2015; a failure to meet any requirement constituted an event of default. (Stipulated Facts ¶ 89; Trial Ex. 18 at 3–4.)

As described above, Coyle's approval of the June 2014 amendments, and Montemarano's confirmation of his understanding, reflected that the 12-month extension was illusory. (Trial Ex. 74 at WF_TS_0034370–0034371.) Similarly, the Credit Modification Request drafted by

24

Ferrara indicates that the bank officers associated with the CRS financing facility were cognizant that the loan could be terminated for any (or no) reason on 30 days' notice. (Trial Ex. 74 at WS_TS_0034355.)

The evidence shows that as a result of the replacement financing deadlines, the 30-day no-default termination provision, the ever-increasing account block and the punitive account monitoring fees, the June 2014 amendments provided a one-year extension only on paper for purposes of assuaging CRS's auditors, and in reality amounted to a short-term forbearance agreement with increasing penalties if the CRS Debtors did not secure replacement financing.

###### D.    The February 2015 Amendments

Pursuant to the December 2014 financing facility amendments, the CRS Debtors agreed to cause TSE to deliver to Wells Fargo its IRS form 8821, which allowed Wells Fargo to obtain TSE's payroll tax information. (Stipulated Facts ¶ 135.) On January 27, 2015, Wells Fargo received a Tax Guard report for TSE showing $87 million in unpaid TSE payroll taxes ($78 million in payroll taxes and $9 million in penalties and interest) for the third and fourth quarters of 2013. (Stipulated Facts ¶ 136.) The next day, Cassera admitted that the Tax Guard report was accurate and disclosed to Wells Fargo that TSE also had not paid December 2014 payroll taxes of $26 million. (Stipulated Facts ¶ 137.) Following the discovery of TSE's federal payroll tax delinquencies, and as a pre-condition to any further advances to the CRS Debtors, Wells Fargo asked for the immediate appointment of chief restructuring officers for CRS and TSE. (Stipulated Facts ¶ 138.) On January 30, 2015, Wells Fargo and the Debtors agreed to the appointment of Robert Riiska as chief restructuring officer for the CRS Debtors, and the appointment of Barry Kasoff as the chief restructuring officer for TSE. (Stipulated Facts ¶ 139.)

The parties also agreed that TSE should immediately file for bankruptcy while CRS undertook an orderly liquidation.  (Stipulated Facts ¶ 140.)

On or about February 4, 2015, the CRS Subsidiaries entered into an amendment to their APA Facility with Wells Fargo.  (Stipulated Facts ¶ 94; Trial Ex. 20.)  The February 4, 2015 amendment to the APA Facility required the CRS Subsidiaries to retain a chief restructuring officer with specified powers and increased the non-default and default interest rates by 2% each. (Stipulated Facts ¶ 97.)  It also provided for the payment of a $500,000 amendment fee.  (*Id.*)

The $500,000 amendment fee provided by the February 4, 2015 amendment was charged against the financing facility and paid by the CRS Debtors.  (Stipulated Facts ¶ 98.)  Chobot testified on cross-examination that by the time the decision to charge the $500,000 amendment fee was made, TSE was already in bankruptcy, the decision to liquidate the CRS Debtors had been made, and a chief restructuring officer had been appointed for that purpose.  (Trial Tr. at 133:13–23.)

In his declaration, Chobot testified that an orderly liquidation benefited CRS and its creditors.  (Chobot Decl. ¶ 46.)  Chobot asserted that under the wind-down plan agreed to by the parties, accounts receivable collections would be maximized and over 30,000 temporary employees would retain their jobs through an orderly transition to other staffing companies.  (*Id.*) When questioned on cross-examination about the goals of the liquidation process, Chobot admitted that Wells Fargo wanted to maximize its collection on its receivables but pointed out that its goal of a maximization of receivables collections fit with an orderly transition of temporary workers to other staffing companies.  (Trial Tr. at 135:4–15.)

Chobot conceded that the reason Wells Fargo continued to fund the CRS Debtors' operations, even after decisions were made to shut down parts of the business, was to maximize

26

the collection of receivables.  (*Id.* at 137:7–11.)  Chobot testified that CRS's contracts with its customers were not immediately terminated.  Instead, advance contract termination notices were given to the customers, so that CRS's customers would not have an excuse to refuse to pay the receivables that had been pledged to Wells Fargo.  (*Id.* at 136:3–137:6.)

Chobot testified that when Wells Fargo evaluated its options, it determined that an orderly liquidation with some level of cooperation from the owners and management represented Wells Fargo's best chance for a full recovery.  (Trial Tr. at 138:21–25.)  Wells Fargo estimated a $12 million loss on its loan if it did not fund CRS's business and instead immediately shut it down.  (*Id.* at 139:1–9; Trial Ex. 20.)

### E.    The Cash Management System and Payroll Overdraft

Every business day CRS made payments to TSE on account of payroll and similar obligations related to temporary workers for which TSE was acting as the PEO.  (Joint Pre-Trial Order ¶ 29; Chobot Decl. ¶ 52.)  Prior to the TSE bankruptcy, as TSE payroll checks were presented on the four TSE Payroll Accounts, the debits from the presentment of those checks would automatically charge the Master Payroll Funding Account and CRS would then transfer funds to cover the charges for the payroll checks.  This process also applied to any other account charges, such as charges for overdrafts that were incurred in the TSE Payroll Accounts.  (Chobot Decl. ¶ 52.)

In this respect, in connection with the cash management system established by TSE and CRS, TSE generally paid wages to the employees even before issuing an invoice to CRS for payment of such wages.  (Chobot Decl. ¶ 52.)  It was TSE and CRS—and not Wells Fargo—that established this cash management system, including the process for the funding of TSE's payroll checks.  (Chobot Decl. ¶ 52; "Poole Deposition Transcript," Trial Materials 8 at 12:14–24.)

27

Under the established system, the only way for the employees to be paid was for Wells Fargo to authorize and advance money to CRS at CRS's request. (Chobot Decl. ¶ 61.) Upon such a request from CRS, Wells Fargo would then transfer the money to the Master Payroll Funding Account to cover the checks written to pay the employees. (Chobot Decl. ¶ 61.)

Following the established procedure between CRS and TSE and the existing cash management system, on January 30, 2015, as a result of the presentment of payroll checks and other items, intra-day overdrafts were created in the TSE Payroll Accounts as follows (the "Payroll Overdraft"):

- TSE Payroll Account ending in 662–$291,993.48;

- TSE Payroll Account ending in 670–$706,478.86;

- TSE Payroll Account ending in 686–$1,445,017.73; and

- TSE Payroll Account ending in 3002–$117,746.15.

(Joint Pre-Trial Order ¶ 142.)

As a result of Wells Fargo's automated ZBA account process, and in accordance with ordinary pre-petition arrangements, the TSE Payroll Account balances were brought to zero at the end of the day on January 30, 2015. (Joint Pre-Trial Order ¶ 143; Poole Dep. Tr. at 36:3–7.)

The overdraft (negative) balances totaling $2,557,327.96 were moved from the four TSE Payroll Accounts to the Master Payroll Funding Account, causing a net negative (overdraft) balance in the Master Payroll Funding Account of $2,548,209.63 as of the close of business on January 30, 2015. (Joint Pre-Trial Order ¶ 144; Chobot Dep. Tr. at 199:18–200:10; Trial Ex. 210.) Even though the overdraft balances were moved to the Master Payroll Funding Account, they remained obligations of the respective TSE Payroll Account, each of which had its own unique tax identification number. (Trial Tr. at 141:6–11.)

28

When the overdrafts were moved to the Master Payroll Funding Account, they appeared on the Master Payroll Funding Account statement as obligations of the TSE Payroll Accounts in which CRS agreed to fully indemnify Wells Fargo for overdrafts under the Indemnification Agreement. (Trial Ex. 210 at 9; Trial Tr. at 141:14–142:25; Chobot Tr. at 220:20–222:10.)

As reflected in the relevant account statement, the "Transaction Detail" for January 30, 2015 includes four entries reflecting transfers of a total of approximately $2.5 million in funds to TSE Payroll Accounts with numbers ending in 4662, 4670, 1686 and 3002. (Trial Ex. 210 at 9.) As of the close of business on the TSE Petition Date, the account balance in the Master Payroll Funding Account was overdrawn by $2,544,849.69, reflecting the $2.5 million Payroll Overdraft that was transferred to the TSE Payroll Accounts. (Trial Ex. 210.) The four TSE Payroll Accounts themselves reflected either zero or small credit balances as of the close of business on the TSE Petition Date. (Joint Pre-Trial Order ¶ 147.)

F.    **The Indemnification Agreement**

Following the discovery of the payroll tax fraud at TSE and as part of the discussions concerning Wells Fargo's agreement to provide funding to CRS for the orderly liquidation, the parties discussed Wells Fargo's providing funding to CRS to pay the TSE temporary employees that it provides as the PEO. Specifically, it was agreed that Wells Fargo would continue to provide funding to assure payment of wages to the TSE employees on certain terms and conditions, including assurances that the funding would be used for its intended purpose of paying the employees who did work on CRS's behalf. (Chobot Decl. ¶ 51; Montemarano Dep. Tr. at 92:17–93:15.)

The discussions between Wells Fargo and CRS to effectuate the orderly wind-down of both TSE and CRS, including the funding of payroll, took place throughout the day on Friday,

January 30, 2015, the business day before TSE filed a petition for chapter 11 relief (Monday, February 2, 2015). (Chobot Decl. ¶ 53.) However, the agreements between Wells Fargo, TSE and CRS were not in place until after the Federal Reserve wire deadline that Friday night. (*Id.* ¶ 53.)

As a result, as part of the agreements between the parties to assure that the proceeds of advances made by Wells Fargo to CRS would be used for their intended purpose of paying the TSE employees without concern that the funds would either be subject of an IRS lien or otherwise misdirected, Wells Fargo and CRS entered into an Irrevocable Direction and Indemnification Agreement dated January 30, 2015 (the "Indemnification Agreement") pursuant to which CRS agreed to be held responsible for any overdrafts in the four TSE Payroll Accounts. (Joint Pre-Trial Order ¶ 141; Chobot Decl. ¶ 54; Trial Ex. 19.)

In this agreement, CRS provided an indemnity on the four TSE Payroll Accounts to allow Wells Fargo to honor and/or fund any overdrafts arising in the TSE Payroll Accounts through the weekend and until the following week when it was expected that this Court would enter an order authorizing the payment of wages to TSE's employees once TSE filed its bankruptcy case and filed the appropriate motion. (Chobot Decl. ¶ 55.)

Specifically, as set forth in that agreement, CRS directed Wells Fargo to honor and/or fund any overdraft or negative balance arising in any TSE account. CRS agreed, in exchange, to:

> indemnify and hold Wells Fargo harmless from any and all losses, expenses, claims, obligations, liabilities, damages of any kind, nature or description arising in connection with or related to the funding or honoring by Wells Fargo of any such overdrafts or negative account balances.

(Trial Ex. 19 at 1.)

Thus, the purpose of the agreement was to obtain CRS's guarantee for the payment of TSE's payroll and not for CRS to guarantee any other Cassera-affiliated account. (Montemarano

Dep. Tr. at 97:4–10.)  The Payroll Overdrafts occasioned by the January 30, 2015 payroll were
overdrafts or negative account balances "arising in connection with or related to the funding or
honoring by Wells Fargo" of the overdrafts or negative account balances and are therefore within
the scope of the contractual indemnity provided by CRS.

Had CRS and TSE not agreed to sign the Indemnification Agreement, Wells Fargo could
have returned the payroll checks by Monday morning, its internal deadline, and the workers
would not have been paid.  (Joint Pre-Trial Order ¶ 146; Chobot Decl. ¶ 62; Poole Dep. Tr. at
26:4–12, 41:15–43:6.)  Instead, Wells Fargo honored the checks and likely did so because CRS
was obligated to indemnify Wells Fargo.  (Trial Ex. 34; Montemarano Dep. Tr. at 104:12–15.)

## G.    Diligence Undertaken Prior to Making the Payroll Advance

Following this Court's entry of the wage order (the "Wage Order," Trial Ex. 54) and
bank account order (the "Bank Account Order," Trial Ex. 53) on February 4, 2015, Wells Fargo
made a $9 million advance to CRS that was used to pay, among other expenses, two weeks of
payroll of employees of Debtor TSE.  (Joint Pre-Trial Order ¶ 153; Trial Ex. 54.)

Before Wells Fargo made the $9 million advance to cover the overdrafts, significant
diligence was undertaken.  On Friday, January 30, 2015 and into the weekend, Wells Fargo spent
a significant amount of time with the two CROs ascertaining and confirming that the checks
drawn on the TSE Payroll Accounts were based on legitimate invoices and that there were
legitimate employees entitled to be paid for work done on CRS's behalf as confirmed by the
CROs.  (Chobot Decl. ¶ 54, Montemarano Dep. Tr. at 103:8–104:15.)

In view of the fluidity of the situation, both the TSE and CRS CROs did not want Wells
Fargo to make advances to CRS without being certain that the funds would be used in
furtherance of the legitimate wind-down efforts.  (Chobot Decl. ¶ 65.)  As part of this process,

the TSE CRO identified the TSE Payroll Accounts as the exclusive accounts for payment of

TSE's employees and requested that Wells Fargo delink the other Cassera-affiliated Accounts

from the TSE Payroll Accounts. (*Id.* ¶ 66; Montemarano Dep. Tr. at 96:9–97:20.)

Wells Fargo also sought to delink the accounts as a result of TSE's imminent bankruptcy

filing. Delinking would prevent a non-debtor account linked to a debtor account sweeping back

and forth. Delinking would also isolate any TSE-related charges and preserve such charges

pending entry of the Wage Order. (Trial Tr. at 159:23–160:6; Trial Exs. 33, 35.) Once the TSE

Payroll Accounts were identified, Wells Fargo and CRS entered into the Indemnification

Agreement. (Chobot Decl. ¶ 66.)

As result of CRS's agreement to indemnify Wells Fargo for the overdrafts pursuant to the

Indemnification Agreement as well as TSE's commitment to seek entry of the Wage Order and

Bank Account Order, Wells Fargo decided not to return any of the checks or other items that had

been presented on January 30, 2015 for payment on the TSE Payroll Accounts as it would have

been entitled to do under the account agreements and federal regulations. (Joint Pre-Trial Order

¶ 146; Chobot Decl. ¶ 62; Poole Dep. Tr. at 26:2-25, 42:8–43:6.)

Further, following entry of the Wage Order and Bank Account Order, on February 5,

2015, Riiska, on behalf of the CRS Debtors, submitted a roughly $9 million funding request to

Wells Fargo. (Joint Pre-Trial Order ¶ 152; Trial Ex. 36.) Among other line items, the funding

request clearly identified the Payroll Overdraft for the overdrawn amounts in the TSE Payroll

Accounts in the amount of $2,572,570.26—representing a pre-existing obligation to be paid by

CRS. (Trial Ex. 36.)

On February 5, 2015, Wells Fargo recorded a total of $8,976,000 in advances under the

CRS Debtors' APA Facility. (Joint Pre-Trial Order ¶ 153.) Those advances were credited to the

CRS account ending in 6288 at Wells Fargo. (*Id.*) CRS immediately thereafter transferred $2,572,570.26 from the CRS 6288 account to the Master Payroll Funding Account at Wells Fargo in satisfaction of the Payroll Overdraft arising from payment of the pre-petition payroll obligations of the four specifically identified and debited TSE accounts. (*Id.*)

The payment was thus a CRS (at the time, a non-debtor) payment used to pay a pre-existing CRS liability—CRS's guarantee of overdrafts that originated in the TSE Payroll Accounts and the payment was for CRS's benefit since it paid payroll at TSE for CRS's customers. (Chobot Dep. Tr. 239:2–9; Trial Ex. 19.) Moreover, the payment was in furtherance of the understanding and overall goal that the employees were to be paid, thereby providing additional value. (*Id.* at 239:10–15.)

Had Wells Fargo not honored those payroll checks over that weekend and before the Court approved the advances on February 4, 2015, the 9,117 employees exclusively servicing CRS's customers would not have been paid and would have reasonably been expected to quit, resulting in massive offsets and counterclaims by CRS customers against amounts payable to CRS. (Trial Tr. at 133:24–137:11; Chobot Decl. ¶¶ 46, 63.) Moreover, the remainder of the 30,000 employees—employees that CRS relied upon to fulfill its contractual obligations with its customers—would have left soon thereafter. Consequently, CRS would have been effectively out of business immediately resulting in catastrophic consequences to all creditors and stakeholders. (Chobot Decl. ¶ 64; Feltman Dep. Tr. at 50:12–18.)

### H.    The TSE 2002 Account Charges

After the TSE Petition Date, Wells Fargo informed Tri-State that it was no longer willing to provide treasury management services or to serve as its bank and requested that Tri-State close its accounts. (Stipulated Facts ¶ 154; Trial Tr. at 166:12–21.) By the end of March 2015, only

33

$70,976.76 remained in Tri-State's accounts at Wells Fargo, and by April 13, 2015, only

$1,361.19 remained in Tri-State's accounts at Wells Fargo.  (Feltman Decl. ¶ 24; Trial Exs. 168–

212.)

 Donald Leedom was the Debtors' day-to-day contact in Wells Fargo's Treasury

Department.  (Trial Tr. at 145:16–18.)  Leedom's deposition was not taken, and he was not

called to testify at trial.  No adverse inference will be drawn from these facts.  (*Id.* at 145:18–23.)

 At her deposition, Natalie Poole, a manager of Wells Fargo's Treasury Risk Group,

explained that when an account is closed, Wells Fargo typically holds back the amount needed to

cover customer service charges that have not yet been processed and that some combination of

the treasury officer and the portfolio management team is responsible for reserving sufficient

funds.  (Poole Dep. Tr. at 68:20–69:23.)  Chobot did not have any discussions with Leedom (the

treasury officer) about why he had not taken a reserve for accrued and unpaid service charges in

Tri-State accounts.  (Trial Tr. at 169:8–13.)

 On or about February 24, 2015, at the request of the TSE chief restructuring officer,

Wells Fargo created three accounts in TSE's name, including one that was assigned an account

number ending in 2002 (the "TSE 2002 Account").  (Stipulated Facts ¶ 155.)  There are no

signature cards or any other documents or agreements executed by TSE or the Trustee with

respect to any TSE accounts that were opened post-petition.  (Stipulated Facts ¶ 156.)  Moreover,

the Trustee testified that he never signed any account agreements or other documentation for the

TSE 2002 Account or the other accounts opened post-petition, nor did he ever authorize anyone

working for him to sign any such agreements or other documentation.  (Feltman Decl. ¶ 26.)

 From February 24, 2015 until April 13, 2015, there was no banking activity in the TSE

2002 Account.  (Stipulated Facts ¶ 157.)  On April 13, 2015, Wells Fargo recorded a bank

service charge of $289,439.79 in the TSE 2002 Account, resulting in a negative (overdraft)

balance in the TSE 2002 Account in that amount. (Stipulated Facts ¶ 169; Trial Ex. 162.) The

Trustee learned of the charge when one of his staff discovered the overdrawn TSE 2002 Account

using the online portal access to TSE's accounts that had been provided to him by Wells Fargo.

(Feltman Decl. ¶ 29.)

The TSE 2002 Account bank statement provided no detail whatsoever concerning

the nature of Wells Fargo's April 13, 2015 charge. It consisted of a one-line description, "Client

Analysis Services Charge." (Feltman Decl. ¶ 31; Trial Ex. 239.) The information that was

available to the Trustee through the Wells Fargo online portal also shed no light on the nature of

the April 13, 2015 charge. The Trustee later learned that the detailed support for what Wells

Fargo characterized as "Client Analysis Services Charges" was set forth in Tri-State's (not

TSE's) monthly Client Relationship Analysis Summaries, and those summaries were not

available to the Trustee at that time. (Feltman Decl. ¶ 32; Trial Exs. 162–167.) Chobot

acknowledged on cross-examination that unless a party had access to Tri-State's monthly Client

Relationship Analysis Summaries, the basis for the April 13, 2015 charge to the TSE 2002

account could not be determined. (Trial Tr. at 172:9–14.)

Wells Fargo's Treasury group was responsible for posting any charges to TSE's

accounts. (Chobot Dep. Tr. at 157:16–21.) Chobot did not discuss Wells Fargo's April 13, 2015

charge with Leedom or anyone else in the Treasury Department before the $289,439.79 charge

was posted to the TSE 2002 Account. (*Id.* at 157:12–15.) Chobot testified that he subsequently

directed Leedom to provide copies of the monthly Tri-State Client Relationship Analysis

Summaries to the TSE chief restructuring officer in mid-to-late May 2015. (Trial Tr. at

173:13–174:22.) However, the email transmitting those summaries shows that they were not

35

delivered to the TSE chief restructuring officer until after he questioned Leedom about the TSE 2002 Account charges and Leedom had assured him that all of the charges "are related to the TS Employment Accounts." (Trial Ex. 39 at RSI_000000332; Trial Ex. 38.) Poole acknowledged at her deposition that Leedom's statement to the TSE chief restructuring officer was not accurate. (Poole Dep. Tr. at 84:2–12.)

Chobot testified at his deposition that the sole purpose of the TSE 2002 Account was to accumulate the fees charged against the TSE payroll accounts in one account for administrative and billing proposes. (Chobot Dep. Tr. at 149:25–150:7.) Chobot similarly testified that the April 11, 2015 service charge was not really a charge against a TSE account, and that the charges were simply a summary in what was being treated as an administrative account or master billing account. (Trial Tr. at 170:10–19.) However, the evidence at trial, discussed below, did not support this assertion.

First, the evidence showed that the TSE service charges already were being summarized and tracked by Wells Fargo, namely in the Client Relationship Analysis summaries and account detail attached thereto. (Trial Exs. 162–167.) Thus, there would have been no reason to create an account for mere tracking purposes.

Second, the evidence showed that Wells Fargo treated the TSE 2002 Account as a real account. Wells Fargo assessed account services charges for the TSE 2002 Account, the same as it did for TSE's other accounts (Stipulated Facts ¶ 187; Trial Exs. 162–167), and treated the overdraft in the TSE 2002 Account as a real overdraft, describing it as such. (Trial Exs. 42, 58.)

Third, Chobot's explanation that Wells Fargo used the TSE 2002 Account to track TSE accrued service charges, for administrative purposes only, is inconsistent with other evidence. The evidence showed that $200,000 of the charges were Tri-State, not TSE, account charges.

36

(Stipulated Facts ¶ 228.)  Moreover, the evidence was clear that a $100,000 July 2015 charge to the TSE 2002 Account did not pertain to accrued service charges.  (Chobot Decl. ¶ 92.)

Fourth, Wells Fargo's Client Relationship Analysis summaries clearly indicate that it was Wells Fargo's intention to "debit" the TSE 2002 Account to pay for the service charges.  (Trial Tr. at 180:15–181:13; Trial Exs. 162–163.)  The Court finds that Wells Fargo would not have done so if this were not a "real" account.

Finally, there is no indication in any document that this account (which was titled a payroll account) was merely an administrative account.  When asked why the TSE 2002 Account was titled a payroll account, Chobot testified that Leedom initially had set up the account as a payroll account, but when Leedom decided to use it as the master billing account, he never changed the description.  (Trial Tr. at 171:2–8.)  However, on further examination Chobot admitted that he had never actually had any conversations with Leedom about the reason for the account title.  (*Id.* at 171:9–13.)

Following the Trustee's discovery of the existence of TSE 2002 Account and the April 13, 2015 "Client Analysis Service Charge," the Trustee asked the TSE chief restructuring officer and his staff whether they were familiar with the account.  They indicated that the TSE chief restructuring officer had requested that Wells Fargo open debtor-in-possession accounts prior to the Trustee's appointment, but they were not aware that any of those accounts were being used by Wells Fargo.  They also had no knowledge of any charges to the TSE 2002 Account.  (Feltman Decl. ¶ 33; Trial Ex. 41.)

The Trustee testified that he directed his team to investigate the TSE 2002 Account and the nature of the April 13, 2015 charge, and requested that Wells Fargo provide support for the charge.  (Stipulated Facts ¶ 170; Trial Ex. 163; Feltman Decl. ¶ 34.)  While that inquiry was

37

underway, the Trustee discovered—using the Wells Fargo online portal—that on May 11, 2015,

Wells Fargo had recorded another charge of $113,727.78 in the TSE 2002 Account, causing an

increase in the negative (overdraft) balance in the TSE 2002 Account from $289,439.79 to

$403,167.57.  (*Id.*)  Again, the TSE 2002 Account statement provided no detail concerning the

nature of the charge, which consisted of the one-line description "Client Analysis Services

Charge."  (Feltman Decl. ¶ 35; Trial Ex. 240.)

　　　A dispute arose in May 2015 concerning whether all of the funds advanced by Wells

Fargo pursuant to the April 15, 2015 stipulation, some of which had been deposited in a TSE

account at Santander Bank, were needed to satisfy payroll obligations.  Wells Fargo demanded the

return of $1.1 million of those funds to CRS.  (Stipulated Facts ¶¶ 166-167.)  On May 13, 2015,

the CRS Debtors (through their chief restructuring officer) and Wells Fargo filed a joint

application for an order seeking (among other things) return of funds in the TSE Santander

Account.  (Stipulated Facts ¶ 168; Trial Ex. 56.)  In the alternative, CRS and Wells Fargo

requested that the funds be applied to satisfy (a) Wells Fargo's and/or CRS's obligations to fund

the Trustee's investigation and administration of TSE's estate, and (b) TSE's liability to Wells

Fargo arising from overdrafts and future overdrafts resulting from checks that have been issued

but not yet drawn on accounts maintained by TSE at Wells Fargo.  (Stipulated Facts ¶ 168; Trial

Ex. 56 at ¶ 4.)

　　　Although the Trustee disputed Wells Fargo's position concerning the parties' respective

rights to the funds in the TSE Santander Bank account, the amount of the overdraft referenced in

the declaration supporting the May 13, 2015 application ($371,767.55) appeared to be accurate to

the Trustee because it equaled the amount of the payroll check overdrafts in TSE's accounts,

excluding the TSE 2002 Account.  (Feltman Decl. ¶ 39; Trial Ex. 57 ¶ 9.)  Neither the May 13,

2015 application nor the declaration submitted in support thereof mentioned using any funds to

pay Wells Fargo service charges (including but not limited to any service charges reflected in the

TSE 2002 Account), let alone services charges related to Tri-State Group accounts. (Feltman

Decl. ¶ 40; Trial Exs. 56–57.)

By late May 2015, the Trustee had become suspicious that the TSE 2002 Account service

charges primarily related to Tri-State accounts and/or were otherwise improper. The Trustee

testified that in late May or early June 2015, he had a conversation with Chobot, his primary

Wells Fargo contact for CRS and TSE issues. The Trustee inquired about the nature of the bank

service charges in the TSE 2002 Account. The Trustee testified that Chobot told him "not to

worry" about the charges, that they were "administrative" in nature and "were being taken care

of," and that the charges would have no impact on TSE's estate (or words to that effect).

(Feltman Decl. ¶ 41.)

The Trustee testified that notwithstanding the conversation, he continued to suspect that

bank service charges in the TSE 2002 Account related to Tri-State accounts were improper, and

that TSE's estate would directly or indirectly be paying for those charges. (Feltman Decl. ¶ 42.)

On June 11, 2015, Wells Fargo recorded another bank service charge of $27,102.29

in the TSE 2002 Account, causing an increase in the negative (overdraft) balance in the TSE 2002

Account from $403,167.57 to $430,269.86. (Stipulated Facts ¶ 171; Trial Ex. 164.)

On June 25, 2015, the Bankruptcy Court approved a Stipulation and Order Concerning

Funding Arrangements between the Trustee, Wells Fargo Bank, Sterling National Bank and

Corporate Resource Services, Inc., resolving Wells Fargo's May 13, 2015 motion. (Stipulated

Facts ¶ 174; Trial Ex. 58.)

The June 25, 2015 stipulation provided:

CRS and Wells Fargo shall remain obligated to the Trustee to fund any reasonable and substantiated payroll or payroll-related obligations, including the out-of-pocket cost of payroll tax returns, SUTA and W-2s associated with payroll activities occurring through April 30, 2015 that were directed by CRS and/or [TSE's chief restructuring officer].

(Stipulated Facts ¶ 177; Trial Ex. 58 ¶ 4.)

In the June 25, 2015 Stipulation, CRS (through its chief restructuring officer) represented, and Wells Fargo agreed, that the balance of the TSE Wells Fargo accounts, including overdrafts, charges and fees related thereto, was approximately $-825,785.11 as of that date. The Trustee made no representation about the amount of the overdraft. (Trial Ex. 58.) The June 25, 2015 stipulation also provided (with an exception not relevant to this dispute) that all rights, claims and defenses of the Trustee, Wells Fargo, CRS and any other person or party were expressly preserved and not waived. (Stipulated Facts ¶ 178; Trial Ex. 58 ¶ 8.)

The Trustee testified that during negotiations leading up to the June 25, 2015 stipulation, he learned that Wells Fargo was attempting to cause TSE or the CRS Debtors to pay the overdraft in the TSE 2002 Account that had been created as a result of purported bank service charges. The Trustee testified that he insisted that (i) any stipulation with Wells Fargo must specifically reserve all parties' rights to challenge the purported service fees and other charges being assessed by Wells Fargo, and (ii) no representation would be made by the Trustee or on his behalf concerning the validity or amount of any Wells Fargo charges or overdrafts in TSE's accounts. (Feltman Decl. ¶ 45.)

On June 30, 2015, Wells Fargo recorded a $430,269.86 advance against one of the CRS Subsidiaries' financing facility loan accounts. (Stipulated Facts ¶ 179.) Wells Fargo immediately thereafter credited that amount to the TSE 2002 Account, reducing the $430,269.86 overdraft reflected in the TSE 2002 Account to zero. (Stipulated Facts ¶ 179.)

40

On July 1, 2015, Wells Fargo recorded another advance, this one for $100,000, against one of the CRS Subsidiaries' loan accounts. (Stipulated Facts ¶ 180.) Wells Fargo immediately thereafter credited that amount to the TSE 2002 Account. (Stipulated Facts ¶ 180; Trial Ex. 242.) The following day, Wells Fargo recorded a "Client Analysis Services Charge" of $100,000 in the TSE 2002 Account, bringing the balance in that account back to zero. (Stipulated Facts ¶ 181; Trial Ex. 242.)

Beginning in July 2015, Wells Fargo stopped reflecting service charges in any TSE account. (Trial Tr. at 180:19–182:1.) Chobot testified that he was not involved in the decision to stop reflecting service charges in the TSE 2002 Account. (*Id.* at 181:19–21.) Chobot testified that he believed it related to the closing of TSE accounts, and understood that TSE was to receive an invoice for any service charges. (*Id.* at 182:2–5.) He further testified that although the invoice would have been sent to Tri-State, he believed that copies also were delivered to the TSE chief restructuring officer. (*Id.* at 182:13–19.) However, on further examination he admitted that the TSE chief restructuring officer had been discharged as of early July 2015, and Chobot had no knowledge where the invoices might have been delivered. (Trial Tr. at 182:20–183:2.) No invoices were submitted into evidence by Wells Fargo.

The Trustee testified that he and his team did not learn that Wells Fargo had recorded the July 1, 2015 $100,000 advance against the CRS Debtors' loan facility until they received that information in connection with Rule 2004 discovery and the parties' pre-litigation settlement negotiations. (Feltman Decl. ¶ 47.)

The Trustee further testified that he and his team did not learn the reason for the July 2, 2015 $100,000 charge to the TSE 2002 Account, or that additional bank service charges had been

41

assessed in July and August 2015, until they also received that information in connection with Rule 2004 discovery and the parties' pre-litigation settlement negotiations.  (Feltman Decl. ¶ 47.)

$227,809.52 of the bank service charges against the TSE 2002 Account related to January through May 2015 activity in Tri-State accounts.  (Feltman Decl. ¶ 48; Trial Exs. 162–167.) $147,000 of the bank service charges against the TSE 2002 Account related to overdraft fees arising from post-petition activity in the four TSE ZBA Accounts.  (Trial Tr. at 67:23–70:17; Trial Exs. 162–167.)  Wells Fargo assessed another $43,478.58 in bank service charges that were not reflected in any TSE account statement; $18,602.38 of those bank service charges related to activity in Tri-State accounts.  (Stipulated Facts ¶ 185; Trial Exs. 165–167, 186.)

There was no activity in the TSE 2002 Account other than the service charge activity described above, and there has never been any activity in the other TSE accounts that were opened post-petition.  (Stipulated Facts ¶¶ 188-189.)  Nonetheless, from March through August 2015, Wells Fargo assessed $8,379.64 in post-petition service charges relating to the three accounts opened post-petition and a fourth unused TSE account.  (Stipulated Facts ¶ 187.)

The Trustee testified that he would have immediately closed those accounts if he had been aware of the TSE 2002 Account and other unused accounts and the service charges.  (Feltman Decl. ¶ 54.)

Finally, the $100,000 service charge assessed on July 1, 2015 exceeds the amount of all TSE and Tri-State post-petition services charges—both legitimate and illegitimate—by $56,521.42.  (Feltman Decl. ¶ 49.)

## I.    The Post-Petition Overdrafts

Following TSE's bankruptcy, TSE's bank accounts were funded with payments from the CRS Debtors.  (Feltman Decl. ¶ 14.)  The bank accounts at Wells Fargo were purposefully

42

maintained with only small or even negative balances. (*Id.*) The Trustee testified that even though funds were regularly needed to meet TSE's payroll and other employment-related obligations as the PEO for the CRS Debtors' businesses, TSE's bank accounts at Wells Fargo typically were not funded before checks and other items were presented for payment. (*Id.*) Instead, TSE's bank accounts at Wells Fargo were funded on an "as needed" or *post hoc* basis at the direction of Wells Fargo or the CRS Debtors' chief restructuring officer, thus purposefully and regularly resulting in overdraft situations in several of the TSE accounts. (*Id.*)

Montemarano testified at his deposition that TSE checking accounts were overdrafted after checks were presented for payment while the TSE and CRS chief restructuring officers reviewed and verified that the checks presented for payment should be paid. (Montemarano Dep. Tr. at 108:22–109:8.) After receiving verification from the chief restructuring officers, Wells Fargo would then fund the overdrafts using the CRS financing facility. (Montemarano Dep. Tr. at 109:5–9.) Montemarano described this as the "standard operating procedure" in TSE's case. (Montemarano Dep. Tr. at 109:9–15.)

Contemporaneous documents confirm that Wells Fargo intended to keep minimal or no credit balances in TSE's accounts. A February 9, 2015 email from Montemarano to Poole and others questioned an account pre-funding strategy for the TSE accounts, stating: "We are still trying to have as little cash in these accounts as possible. . . . We [pre-funded accounts] this week and still have $2.4MM sitting in the account. We need to come up with a better solution for this week as I don't want to do that again." (Trial Ex. 37 at WF_CRS_00006626.)

Well Fargo charged TSE's bankruptcy estate $147,000 in overdraft fees arising from post-petition activity in the four TSE accounts. (Trial Tr. at 67:23–70:17; Trial Exs. 162–167.)

43

Chobot testified that overdraft charge was an automated process and the charge for checks paid while overdrawn was $35 per check. (Trial Tr. at 174:10–12, 19–22.) However, upon review of the underlying bank statements, Chobot could not explain why TSE was assessed monthly overdraft charges for precisely 999 checks on several occasions even though the overdraft activity in the underlying accounts reflected a significantly higher number of checks paid while the account was overdrawn, nor could he explain a monthly overdraft charge for precisely 100 checks when the underlying account statement reflected less than 100 checks had been presented for payment on that account. (Trial Tr. at 174:23–179:16; Trial Exs. 162–164, 227, 233, 235.)

On April 15, 2015, the Court approved a Final Stipulation and Order for Approval of Funding Arrangements between the Trustee, Wells Fargo Bank, Sterling National Bank and Corporate Resource Services, Inc. (Stipulated Facts ¶ 159; Trial Ex. 55.) Pursuant to that stipulation, Wells Fargo and the Trustee stipulated to the use of Wells Fargo cash collateral to administer TSE's estate, including for conducting an investigation into the affairs of TSE, and Wells Fargo agreed to advance to the Trustee up to $1 million from the CRS financing facility. (Stipulated Facts ¶ 162.)

> The April 15, 2015 stipulation provided that Wells Fargo would continue to
>
> provide sufficient funds to CRS commencing on and after the date of the appointment of the Trustee of TSE so that CRS can advance to TSE the amounts required to pay all wages, Federal or State payroll taxes . . . and TSE's direct costs associated with administering TSE's payroll operations accrued . . . through April 30, 2015. [T]o the extent CRS was unable to distribute sufficient funds to TSE . . . [Wells Fargo agrees to] provide sufficient funds directly to TSE to cover any shortfall, and such amounts shall be afforded all of the liens, rights, claims and priorities afforded the TSE Advance.

(Stipulated Facts ¶ 164; Trial Ex. 55 ¶ 4.)

44

The April 15, 2015 stipulation also provided for Wells Fargo's payment of any overdrafts in TSE's Wells Fargo accounts, specifically providing that:

> Subject only to prior verification and review for fraud and misstatements, the Lenders shall pay any and all overdrafts on TSE's Wells Fargo bank accounts for obligations incurred by TSE in connection with payroll, payroll tax and payroll-related expenses commencing on and after the Trustee appointment and relating solely to TSE's operations and servicing with respect to customers of the CRS Borrowers.

(Stipulated Facts ¶ 165; Trial Ex. 55 ¶ 16.)

On cross-examination, Chobot conceded that under the April 15, 2015 stipulation, Wells Fargo was responsible for paying overdrafts in the TSE accounts. (Trial Tr. at 185:6–18.) Chobot also acknowledged during cross-examination that Wells Fargo's Treasury Department had decided to waive the bank services charges associated with the TSE accounts. (Trial Tr. at 185:19–22.) However, Chobot testified that a group of Wells Fargo employees, including himself, decided that the waiver should be withdrawn and payment of the charges pursued. (Trial Tr. at 186:2–187:3.)

### J.    WFFL Lease Payments

Prior to the TSE Petition Date, certain of the CRS Debtors entered into copier lease agreements with WFFL. (Joint Pre-Trial Order ¶ 201; Trial Ex. 107–111.) On February 4, 2015, more than ninety days before the CRS Petition Date, and as part of the agreements and arrangements to continue to provide financing to CRS, the CRS Subsidiaries entered a Bank Products Supplement to the APA (the "Bank Product Supplement"). (Trial Ex. 21.) Pursuant to the Bank Product Supplement, the CRS Subsidiaries acknowledged, confirmed and agreed that all "Bank Product Obligations" of any of the CRS Subsidiaries constitute part of the indebtedness and liabilities of the CRS Subsidiaries to Wells Fargo under the APA and are secured by the Accounts and other assets of the CRS Subsidiaries upon which Wells Fargo at any

45

time has a lien or security interest under or in connection with the APA.  (Joint Pre-Trial Order ¶ 202; Trial Ex. 21.)

WFFL leases were "Bank Products" under the Bank Product Supplement.  That agreement defines Bank Product as "any financial accommodation extended to a Customer by a Bank Product Provider. . . ."  (Trial Ex. 21 ¶ 2.)  A Bank Product Provider is defined as "Wells Fargo Bank, National Association or any of its affiliates."  (Trial Ex. 21.)  WFFL is a subsidiary of Wells Fargo Bank, National Association and therefore an "affiliate."  (Joint Pre-Trial Order ¶ 12.)  In addition, each of the CRS Debtors is defined as a "Customer."  (Trial Ex. 21.)

CRS was responsible for the obligations under the Bank Product Supplement through its Guaranty of each of the APAs with Wells Fargo.  (Joint Pre-Trial Order ¶¶ 34–35.)  The Bank Product Supplement is among the documents executed in connection with financing to CRS under the APA Facility and as a result the obligations thereunder are guaranteed by CRS.  The lease obligors were CRS or its subsidiaries (the Customers to each APA) and each Customer in each APA agreed to guarantee the obligations of CRS.  (Joint Pre-Trial Order ¶ ¶ 34–35; Trial Tr. at 188:11–18.)

On or about June 30, 2015, CRS transferred $240,220.26 ("WFFL Lease Payment") to WFFL to pay off 17 copiers that were leased from WFFL.  (Joint Pre-Trial Order ¶ 203.)  The payment was made upon CRS's requesting that Wells Fargo charge the APA Facility so the leases could be paid off and Wells Fargo's liens released to allow for the sale of the copier machines.  (Trial Tr. at 188:24–189:20.)

The copiers were sold or disposed prior to the Trustee's appointment as CRS Trustee.  (Joint Pre-Trial Order ¶ 206.)  The Trustee does not know and has not shown either what happened to the photocopiers or the consideration received by CRS for the photocopiers.

(Feltman Dep. Tr. at 110:16–112:24.)  Indeed, the Trustee has not even attempted to find out

what happened to the copiers or even the identity of the entity in possession of the copiers.  (*Id.*

at 113:5–21.)

The WFFL Lease Payment was fully secured by the Bank Product Supplement which

extended Wells Fargo's security interest to related bank products involving its affiliates,

including copiers leased by WFFL.  (Trial Ex. 21.)  Since there were excess collateral proceeds

greater than the loan to CRS, WFFL was entitled to those proceeds before other classes of

creditors.  (Chobot Decl. ¶ 100.)  The WFFL Buyout Payment approximated a value slightly less

than the depreciation in the leased copy machines.  (*Id.* ¶ 105.)

### K.        The Indemnification for Legal Fees

Following TSE's bankruptcy, the loan balance on the CRS Debtors' financing facility

was quickly reduced.  The loan balance (which was $58,692,569.94 at the end of February

2015), was reduced to $18,746,968.19 at the end of March 2015, $5,296,447.85 at the end of

April 2015, and had been paid off by the end of May 2015.  (Stipulated Facts ¶¶ 190–193.)

Even though the financing facility had been paid off, Wells Fargo continued to collect

and hold the proceeds of more than $19 million in outstanding CRS Subsidiary accounts

receivable.  (Feltman Decl. ¶ 22.)  By the end of June 2015, Wells Fargo was holding more than

$2.0 million in excess cash proceeds from the collection of CRS Subsidiary accounts receivable,

and was continuing to attempt to collect more than $12 million in outstanding CRS Subsidiary

accounts receivable.  (Feltman Decl. ¶ 22.)

On July 23, 2015 (the "CRS Petition Date"), following the sale of the CRS Debtors'

business, the CRS Debtors commenced bankruptcy proceedings in the District of Delaware.

(Stipulated Facts ¶ 194.)  On August 21, 2015, the Court ordered that the CRS Debtors'

bankruptcy cases be transferred to this District, and on September 22, 2015, Feltman was

appointed chapter 11 trustee for the CRS Debtors' estates. (*Id.* ¶ 195–196.)

On November 24, 2015, the Court approved a stipulation between the Trustee and

Wells Fargo which provided for a turnover to the Trustee of some of the funds held by Wells

Fargo, established a mechanism for collection and turnover of future funds collected, and

permitted Wells Fargo to retain $1.5 million as adequate protection for potential indemnity and

other claims against it. (Stipulated Facts ¶ 198; Trial Ex. 60.)

On and after the TSE Petition Date, Wells Fargo was reimbursed for more than $2.0

million in legal fees by way of advances against the CRS financing facility and/or pursuant to the

November 24, 2015 stipulation using cash collateral that it was holding. (Stipulated Facts ¶¶

199–200; Feltman Decl. ¶ 182.) $1,702,037 of those legal fees between January 2015 and

August 2018 were the fees of counsel representing Wells Fargo in this litigation, with whom the

Trustee and his team interacted with respect to materially all matters pertaining to the Debtors.

(Feltman Decl. ¶¶ 183–84, Trial Exs. 93–106.)

The legal invoices submitted by Wells Fargo's counsel do not provide sufficient detail to

determine which fees pertain to advice about or disputes with Tri-State Group entities, the WFFL

copier leases, or the assessment of services charges against the TSE 2002 Account (Feltman

Decl. ¶ 185; Trial Ex. 93–106), nor do they provide sufficient detail to allocate the services

among the five sets of claims at issue in this litigation. (Feltman Decl. ¶ 186; Trial Exs. 96–

106.)

The Trustee testified that following the conclusion of the trial in this case, there is no

reasonable prospect that Wells Fargo will incur additional legal fees or other losses for which

Wells Fargo is entitled to indemnification from the CRS Debtors, and that as a result any

remaining cash collateral held by Wells Fargo should be released, and all other restrictions on the

estates' use of cash imposed by prior stipulations or orders should be dissolved.  (Feltman Decl.

¶ 188.)

      The Trustee testified that the Debtors' estates incurred more than $850,000 in

investigating the matters that are the subject of the Trustee's complaint, not including costs of

litigation.  (Feltman Decl. ¶ 187.)

      Chobot asserted in his declaration that in addition to the present litigation, Wells

Fargo needed to retain additional cash for three years until the expiration of the time period

during which CRS customers may return checks as collection items.  (Chobot Decl. ¶ 98.)  Wells

Fargo provided no evidence of any actual continuing returned check activity, or about how much

cash reasonably needed to be retained to address that risk.

## V.      LEGAL STANDARDS

### A.     Constructive Fraudulent Transfer

Section 548 of the Bankruptcy Code states in part:

> [t]he trustee may avoid any transfer . . . of an interest of the debtor in property, or
> any obligation . . . incurred by the debtor, that was made or incurred on or within 2
> years before the date of the filing of the petition, if the debtor voluntarily or
> involuntarily . . . received less than a reasonably equivalent value in exchange for
> such transfer or obligation.

11 U.S.C. § 548(a)(1).

      A successful fraudulent transfer claim requires proof of four elements: (1) the debtor

must have an interest in the property; (2) the transfer occurred within two years of the filing of

bankruptcy; (3) the debtor was insolvent at the time of the transfer or became insolvent as a

result thereof; and (4) the debtor received less than a reasonably equivalent value for the interest

transferred.  *BFP v. Resolution Trust Corp.,* 511 U.S. 531, 535 (1994).  A trustee seeking to

avoid the transfer bears the burden of proof.  *Bracaglia v. Manzo (In re United Stairs Corp.)*, 176

B.R. 359, 371 (Bankr. D.N.J. 1995); *In re Big Apple Scenic Studio, Inc.,* 63 B.R. 85, 89 (Bankr.

S.D.N.Y. 1986); *In re North American Dealer Group, Inc.*, 62 B.R. 423, 428–29 (Bankr.

E.D.N.Y. 1986).

## B.    New York Debtor and Creditor Law

The Trustee also seeks to avoid and recover various transfers under the sections 273

through 275 of New York Debtor and Creditor Law (the "NYDCL").  (*See e.g.* Complaint at 39.)

Section 544(b)(1) of the Bankruptcy Code permits the Trustee to use avoidance powers available

to creditors under "applicable law," here, the NYDCL.  11 U.S.C. § 544(b)(1).  The NYDCL

requires that a constructive fraudulent transfer be made without "fair consideration."  *Sharp Int'l*

*Corp. v. State St. Bank & Trust Co. (In re Sharp Int'l Corp.)*, 403 F.3d 43, 53 (2d Cir. 2005);

NYDCL §§ 273, 274, 275.  When examining constructive fraud claims, courts use the term

"fair consideration" interchangeably with "reasonably equivalent value."  *In re Vivaro Corp.*,

524 B.R. 536, 550 (Bankr. S.D.N.Y. 2015) (citing *Estate of Ruffini v. Norton Law Grp. PLLC*

*(In re Ruffini)*, 2014 WL 714732, at *7 (Bankr. E.D.N.Y. Feb. 25, 2014)).  "The only difference

is that the state law concept of 'fair consideration' also includes an examination of good faith—

meaning that 'reasonably equivalent value' is essentially the same as 'fair equivalent value.'"  *Id.*

Because the outcome here does not hinge on the difference between the Bankruptcy Code and

the NYDCL and because the parties extensively employ the term "reasonably equivalent value,"

the Court assess the arguments relating to constructive fraudulent transfers under section 548 of

the Bankruptcy Code.

50

### C.    Preference

Section 547(b) permits the Trustee to avoid any transfer of an interest of the debtor in property: (1) made to or for the benefit of a creditor; (2) for or on account of an antecedent debt owed by the debtor before such transfer was made; (3) made while the debtor was insolvent; (4) made on or within 90 days before the date of the filing of the petition (with respect to creditors who are not "insiders" of the debtor); and (5) that enables such creditor to receive more than it would receive in a Chapter 7 distribution had the transfer not been made.  11 U.S.C. § 547(b).  The Trustee bears the burden of proving each of these elements.  *See* 11 U.S.C. § 547(g); *Lawson v. Ford Motor Co. (In re Roblin Indus., Inc.)*, 78 F.3d 30, 34 (2d Cir. 1996); *Goldberg v. Such (In re Keplinger)*, 284 B.R. 344, 346 (N.D.N.Y. 2002).

## VI.    DISCUSSION

### A.  The Trustee is Entitled to Avoid and Recover the $4.1 Million in Fees Paid to Wells Fargo as Constructive Fraudulent Transfers

For the reasons explained below, the Court finds and concludes that the Trustee is entitled to recover the $4.1 million in fees paid to Wells Fargo as constructive fraudulent transfers.

#### 1.  Scope of Dispute

The Trustee seeks to recover as constructive fraudulent transfers the $4.1 million in fees (the "APA Facility Payments") that Wells Fargo charged CRS within one year of CRS's petition date, consisting of $3.2 million in Account Monitoring Fees and $400,000 in Facility Fees under the June 2014 amendments to the APA Facility, and $500,000 in Amendment Fees under the February 2015 amendments to the APA Facility.  (Plaintiff's Proposed Findings ¶ 312.) Moreover, the Trustee seeks to avoid the underlying obligations, namely, the June 2014 and February 2015 amendments to the APA Facility.

51

During pre-trial proceedings, the parties worked together to substantially narrow the

scope of their dispute. Wells Fargo conceded that the CRS Debtors' paid the fees to Wells Fargo

and that these payments constituted transfers of interests in the CRS Debtors' property. (Joint

Pre-Trial Order ¶¶ 92, 93, 98.) Additionally, Wells Fargo stipulated, for purposes of this trial

only, that the CRS Debtors were engaged in businesses or transactions for which their remaining

property was unreasonably small capital. As a result, the Court is tasked with determining

whether the CRS Debtors received reasonably equivalent value from either the APA Facility

Payments or the incurrence of obligations under the June 2014 and February 2015 amendments.

### 2. Collapsing the Contractual Obligations with the Payment of Fees

To determine whether the CRS Debtors received reasonably equivalent value, the Court

assesses the fee payments and the underlying obligations in their entirety and considers the net

effect of these transactions on the CRS Debtors. *Orr v. Kinderhill Corp.*, 991 F.2d 31, 35 (2d

Cir. 1993) ("[A]n allegedly fraudulent conveyance must be evaluated in context; where a transfer

is only a step in a general plan, the plan must be viewed as a whole with all its composite

implications.").

Tax law commonly employs the integrated transaction doctrine, also referred to as the

step transaction doctrine. *See e.g., Commissioner v. Clark,* 489 U.S. 726, 738 (1989); *Salomon

Inc. v. United States,* 976 F.2d 837, 842 (2d Cir. 1992); *True v. United States,* 190 F.3d 1165,

1173–74 (10th Cir. 1999). "Under this doctrine, interrelated yet formally distinct steps in an

integrated transaction may not be considered independently of the overall transaction." *Clark,*

489 U.S. at 738. Courts have applied this same principle in bankruptcy cases, often referring to

it as "collapsing transactions." *In re Waterford Wedgwood USA, Inc.*, 500 B.R. 371, 379 (Bankr.

S.D.N.Y. 2010) (collecting cases). "Collapsing transactions is compatible with fraudulent

conveyance principles as both emphasize substance over form." *Id.*; *see* 5 COLLIER ON

BANKRUPTCY ¶ 548.03[6] ("Fraudulent transfer law has always exalted substance over form.").

The "real test of a fraudulent conveyance . . . is the unjust diminution of the debtor's

estate." *Orr,* 991 F.2d at 36 (quoting 1 Garrard Glenn, Fraudulent Conveyances and

Preferences § 195, at 348 (rev. ed. 1940)).  In essence, the Court may consider the net effect of a

multi-step transaction.  *Id.*

  Here, the Court finds it proper to collapse the APA Facility Payments with the June 2014

and February 2015 amendments, thereby regarding the amendments as a step in a series of

transactions and treating them as one integrated transaction.  In doing so, the Court assesses the

net effect of the integrated transaction, namely, whether the CRS Debtors received reasonably

equivalent value.  Importantly, integrating the transactions respects each party's arguments; the

Trustee suggests that to "consider the avoidance of the fees in isolation from the agreements

giving rise to the obligation to pay such fees would improperly elevate form over substance."

(Plaintiff's Proposed Findings ¶ 318 (quoting *Armstrong v. Collins*, 2010 WL 1141158, at *29

(S.D.N.Y. Mar. 24, 2010).)  Similarly, Wells Fargo's arguments primarily focus on the extension

of APA Facility and riskier advance of credit, which temporally includes the June 2014 and

February 2015 amendments and APA Facility Payments.  (Defendant's Proposed Findings ¶¶

211–215.)

### 3.  Debtors Did Not Receive Value from Excessive and Punitive Fees

  In determining whether a debtor has received reasonably equivalent value in a transfer,

courts undertake a two-step inquiry: first, a court must determine "whether the debtor received

any value at all in exchange for the transfer; *i.e.* any realizable commercial value as a result of

the transaction," and second, a court must determine "whether that value was in fact reasonably

equivalent . . . ."  *Weisfelner v. Blavatnik (In re Lyondell Chemical Co.)*, 567 B.R. 55, 113–14

(Bankr. S.D.N.Y. 2017) (quoting *Devon Mobile Commc'ns Liquidating Trust v. Adelphia*

53

*Commc'ns Corp. (In re Adelphia Commc'ns Corp.)*, 2006 WL 687153, at *11 (Bankr. S.D.N.Y. Mar. 6, 2006)).

Because the $3.2 million in Account Monitoring Fees are excessive and punitive in nature, the CRS Debtors received no discernable value, let alone reasonably equivalent value. The lack of relationship between these fees and Wells Fargo's monitoring costs leads the Court to find the Account Monitoring Fees to be grossly excessive.  The evidence demonstrates that these fees are not proportional to Wells Fargo's actual account monitoring costs.  (*See* Trial Exs. 75, 76, 79, 82, 83, 84.)  Wells Fargo's only evidence to substantiate additional account monitoring was a two-page report, prepared each month by Ferrara, a Relationship Manager at Wells Fargo.  (*Id.*)  Thus, the Court finds that the value of a two-page monthly report pales in comparison with the $3.2 million in Account Monitoring Fees and that the CRS Debtors received little to no value from this report.

Additionally, the Court finds the monthly increase in the Account Monitoring Fees to be punitive in nature.  The June 2014 amendments to the APA Facility established a monitoring fee of $400,000 per month beginning in August 2014, which was originally set to increase by $100,000 each month thereafter, subject to reduction in the event that a replacement financing commitment letter was delivered by August 31, 2014.  (Stipulated Facts ¶ 75.)  The Court finds that Wells Fargo designed the Account Monitoring Fees to force the CRS Debtors to find replacement financing and to punish the CRS Debtors through the $100,000 increase each month the CRS Debtors remain as customers of CRS Debtors.  (Feltman Decl. ¶ 178.)  Wells Fargo's motive is clear because it conditioned any reduction of monitoring charges on a replacement financing commitment letter.  (Stipulated Facts ¶ 75.)  In making this finding, the Court also gives weight to the fact that prior to June 2014, no amendment fees, monitoring fees or facility

fees were ever charged in connection with the CRS Subsidiaries' financing facility or any amendments. (Stipulated Facts ¶¶ 40, 41, 43, 46, 50, 55, 61, 66, 69.)

Wells Fargo attempted to justify the ever-increasing Account Monitoring Fees with evidence that additional Wells Fargo personnel were involved in monitoring the loan after June 2014. (Chobot Dep. Tr. at 101:17–24.) In his written declaration, Chobot repeated his assertion that additional Wells Fargo staff were needed to confirm the daily collateral position, follow up with CRS's staff on delinquent receivables, independently verify receivables, and review CRS's cash flow budget prepared by its consultant. (Chobot Decl. ¶ 26.) The trial evidence, however, did not support this assertion. Chobot could not name any of the additional personnel (Chobot Dep. Tr. at 101:25–102:3), did not know how many additional people were involved (*id.* at 102:17–20) and did not know whether any internal costs were allocated for those personnel (*id.* at 102:4–10).

The Court is mindful, however, that even excessive fees in which costs overwhelm benefits might provide some value to the CRS Debtors. Under section 548(c) of the Bankruptcy Code, a transferee may avoid rescission of a transfer under the following circumstances:

> a transferee . . . of such a transfer . . . that takes for value and in good faith . . . may retain any interest transferred . . . to the extent that such transferee . . . *gave value* to the debtor in exchange for such transfer or obligation.

11 U.S.C. § 548(c) (emphasis added). A transferee bears the burden of proving that it gave value to the debtor in exchange for the transfer and that it did so "in good faith." *See In re Actrade Fin. Techs., Ltd.,* 337 B.R. 791, 805 (Bankr. S.D.N.Y. 2005) (citing *Breeden v. L.I. Bridge Fund, LLC (In re Bennett Funding Grp., Inc.),* 232 B.R. 565, 573 (Bankr. N.D.N.Y. 1999) ("[Section 548(c)] has been construed as an affirmative defense, all elements of which must be proven by the defendant-transferee.")). Here, Wells Fargo bears the burden of proving that it gave value,

and it fails to carry this burden.  The evidence speaks volumes about Wells Fargo's uncontroverted motive to force the CRS Debtors to leave the bank and find replacement financing.  Wells Fargo built the lack of value into the design of the Account Monitoring Fees so that the CRS Debtors would be "incentivized" to exit the APA Facility with Wells Fargo.

Aggressive action by Wells Fargo designed to incentivize the CRS Debtors to promptly exit their financing relationship with Wells Fargo was permissible, but that does not shield Wells Fargo from liability resulting from the enormous fees that Wells Fargo charged these insolvent debtors.  Importantly, Wells Fargo imposed these fees while the CRS Debtors experienced a shortage of liquidity as a result of business expansion.  It defies logic that a financially distressed borrower could receive value from fees that are designed to be excessive and punitive.  As such, the CRS Debtors did not receive value from these excessive and punitive Account Monitoring Fees.

### 4.    Debtors Did Not Receive Reasonably Equivalent Value

Assuming the CRS Debtors received some value, the Court finds that such value was not reasonably equivalent to the $4.1 million in APA Facility Payments.  First, Wells Fargo contends that CRS Debtors benefited and received value from their uninterrupted ability to borrow from Wells Fargo under the APA Facility.  ("Defendants' Proposed Findings," ECF Doc. # 28, ¶ 214.) Specifically, Wells Fargo contends that reasonably equivalent value resulted from Wells Fargo's forbearance in terminating its lending relationship with CRS and that such forbearance was critical to CRS's operation given its severe liquidity constraints at the time.  (*Id.*)

Indeed, "[i]n some cases, forbearance can constitute 'reasonably equivalent value' under § 548(d)(2)(A)."  *In re Jesup & Lamont, Inc.*, 507 B.R. 452, 471 (Bankr. S.D.N.Y. 2014); *see In re Silverman Laces, Inc.,* 2002 WL 31412465 (S.D.N.Y. Oct. 24, 2002) (holding that the debtor

received "reasonably equivalent value" when the creditor waived its rights to pursue legal

remedies for default and agreed to extend debtor's obligations in return for a security interest in

debtor's inventory, *i.e.,* securing the antecedent debt).

Like the defendants in *Jesup*, Wells Fargo encourages the Court to find reasonably

equivalent value because "Wells Fargo's agreement to extend the APA Facility . . . provided a

lifeline to CRS to continue operating." (Defendants' Proposed Findings ¶ 216(a).)  Putting aside

CRS's eventual chapter 11 bankruptcy, the law does not support Wells Fargo's argument.  The

opportunity to avoid a default or bankruptcy may not necessarily constitute "reasonably

equivalent value."  *Senior Transeastern Lenders v. Official Comm. of Unsecured Creditors (In re*

*TOUSA, Inc.),* 680 F.3d 1298, 1311–12 (11th Cir. 2012) (concluding that under the facts of the

case, the indirect benefit received by subsidiaries in avoiding bankruptcy did not constitute

reasonably equivalent value to the liens they provided to collateralize the parent company's

obligation, as it only *delayed the inevitable*).

Furthermore, the evidence at trial refutes Wells Fargo's contention and shows that the

extension of the APA Facility is at best illusory, where the CRS Debtors did not receive

reasonably equivalent value.  The 30-day no-default termination provision significantly reduces

the value of Wells Fargo's extension of the APA Facility.  Despite Chobot's deposition

testimony that Wells Fargo had committed itself to a 12-month extension (Chobot Dep. Tr. at

107:9–108:7), under the January 2014 amendments, the APA Facility became terminable by

either Wells Fargo or the CRS Subsidiaries on 30 days' notice.  (Stipulated Facts ¶ 65; Trial Ex.

11).  Later amendments to the APA Facility did not alter the 30-day no-default termination

provision.  Essentially, this provision writes out the 12-month extension and puts the CRS

Debtors on the edge of their seat.  Any assurance inherent to the 12-month extension dissipated

because Wells Fargo could stop lending after 30 days.  The fact that Wells Fargo did not in fact

terminate the APA Facility carries very little weight; what matters here is Wells Fargo's ability

to do so.

Additionally, Wells Fargo contends that the CRS Debtors received reasonably equivalent

value because the APA Facility is less costly than any potential replacement lender.

(Defendants' Proposed Findings ¶ 215.)  Specifically, CRS had five proposal letters from various

potential take-out lenders.  Three of the proposals were for lines of credit, the fourth was for a

term loan and the fifth was for a line of credit and term loan.  In comparing the annual fee

structure to the APA Facility, the average of the potential take-out lender fees was almost $1.8

million higher per year than Wells Fargo's most recent annualized fees.  If the proposed term

loans were considered, the potential take-out fees would be $7.9 million higher.  (Chobot Decl. ¶

35.)

The Court finds and concludes that the five proposal letters are not readily comparable

with the APA Facility for two reasons.  First, the competing financing proposals were not

contemporaneous with either the June 2014 amendments or the February 2015 amendments.

"[T]he question of reasonably equivalent value is determined by the value of the consideration

exchanged between the parties at the time of the conveyance or incurrence of debt which is

challenged."  *MFS/Sun Life Trust–High Yield Series v. Van Dusen Airport Servs. Co.,* 910 F.

Supp. 913, 937 (S.D.N.Y. 1995.)  All of these proposals post-dated the June 2014 amendments,

with the CIT proposal made in September 2014 and the other four proposals dated from

December 2014 to January 2015.  (Chobot Decl. ¶¶ 33-34; Trial Exs. 86-90.)  Indeed, the earliest

document in evidence showing the terms of any alternative proposal is an August 25, 2014

presentation by CRS's financial advisor, made nearly two months after the June 2014

amendments.  (Trial Ex. 85.)  Furthermore, putting aside the issue of contemporaneity, the value

resulting from the APA Facility as a more cost-effective financing option does not approximate

the cost to the CRS Debtors.  Because the Court does not deem the proposed term loans similar

to the APA Facility and because the $4.1 million in APA Facility fees significantly exceeds the

$1.8 million in savings, the CRS Debtors did not receive reasonably equivalent value.

Lastly, Wells Fargo contends that it provided the CRS Debtors reasonably equivalent

value by extending $1 billion in new credit with heightened risk.  (Defendants' Proposed

Findings ¶5(a).)  The Court takes issue with Wells Fargo's characterization of the APA Facility.

The APA Facility is a type of account receivables financing, where Wells Fargo advanced funds

to the CRS Debtors secured by their account receivables.  (Stipulated Facts ¶ 12.)  The APA

Facility was a revolving line of credit; as Wells Fargo collected on the account receivables

assigned to it, new receivables would replace old receivables.  In this context, Wells Fargo's

argument based on "new credit" is misleading.  Wells Fargo would have extended new credit if it

had expanded the maximum borrowing amount in the APA Facility.  On the contrary, the

maximum outstanding balance on the APA Facility never increased, and Wells Fargo tied its

forbearance and continued lending to decreased availability and a paydown in the outstanding

loan balance.  All of these were proper but done for Wells Fargo's benefit to reduce its credit risk

before the music stopped.

Wells Fargo did not face heightened risk because its collateral quality improved

throughout 2014.  Wells Fargo internally reported a "dilution rate" for the APA Facility.  At trial,

Chobot explained that the net dilution rate represented the percentage of receivables pledged to

Wells Fargo that were not collected.  (Trial Tr. at 114:16–115:9.)  As of November 2013, the net

dilution rate for the CRS Subsidiaries' accounts receivable that had been pledged to Wells Fargo

was 1%.  (Trial Ex. 71 at WF_TS_00117972–73.)  The accounts receivable base was considered

by Wells Fargo to be "strong."  (*Id.* at WF_TS_0017971.)  After November 2013, the net

dilution rate did not deteriorate and in fact improved throughout 2014.  Wells Fargo's business

records reflect a 0.8% net dilution rate as of May 5, 2014 (Trial Ex. 74 at WF_TS_0034357); a

0.5% net dilution rate as of October 16, 2014 (Trial Ex. 79 at WF_TS_121892); and a 0.5% net

dilution rate as of December 3, 2014.  (Trial Ex. 81 at WF_TS_17719-20.)  This means that

99.5% of the CRS Debtors' accounts receivable were being collected as of December 2014.

Furthermore, Wells Fargo's internal ratings did not reflect heightened risk.  As explained

above in the findings of fact, Wells Fargo employs two internal rating systems—IAR and

BQR/CQR/AQR.  The CRS Debtors maintained a relatively constant IAR.  (Plaintiff's Proposed

Finding ¶¶ 38–50.)  And the December 3, 2014 downgrade did not reflect credit risk because it

resulted from the CRS Debtors' failure to provide a commitment for replacement financing, a

condition imposed by Wells Fargo.  Additionally, the BQR/CQR/AQR composite rating, which

measures the likelihood of default and quality of collateral, improved in January 2014.

(Stipulated Facts ¶ 44.)  In fact, on September 30, 2014, Terry Rothe, a Credit Portfolio Manager

at Wells Fargo, provided in an email several reasons why CRS's BQR rating should be higher.

(Trial Ex. 26 at WF_TS_0121833–0121834.)

### B.  The Payroll Overdraft Cannot Be Recovered as a Constructive Fraudulent Transfer

For the reasons explained below, the Court finds and concludes that the Trustee may not recover the Payroll Overdraft as a constructive fraudulent transfer.

The Trustee seeks to recover $2,572,570.26 in the Payroll Overdraft as a fraudulent transfer under sections 544 and 548 of the Bankruptcy Code and NYDCL §§ 273–275, 278, and 279.  The Payroll Overdraft was incurred in connection with Wells Fargo's honoring of payroll checks for 9,117 TSE employees in the weekend prior to TSE's filing of bankruptcy.

The Trustee argues that the Payroll Overdraft was an obligation of Tri-State—not TSE or CRS—to Wells Fargo.  (Plaintiff's Proposed Findings ¶ 330.)  Further, the Trustee argues that since neither TSE nor CRS owed any obligation to Tri-State that was reduced or satisfied, CRS did not receive reasonably equivalent value in exchange for the satisfaction of a Tri-State obligation to Wells Fargo.  (*Id.* ¶ 332.)  Lastly, the Trustee emphasizes that Tri-State owed tens of millions of dollars to TSE, not the reverse.  (*Id.*)  The Trustee essentially urges the Court to consider the Payroll Overdraft in isolation from other related transactions.  The Court refuses to do so because "an allegedly fraudulent conveyance must be evaluated in context."  *Orr v. Kinderhill Corp.*, 991 F.2d 31, 35 (2d Cir. 1993).  Trustee's position is untenable for two reasons.  First, despite the Trustee's assertion, the Payroll Overdraft constituted an obligation of CRS, and the subject transfer satisfied CRS's guaranty obligation to Wells Fargo under the Indemnification Agreement.  Second, the Payroll Overdraft not only preserved the value of CRS's accounts receivable by paying TSE's employees who worked for CRS's customers at the time, it also allowed CRS to generate new accounts receivable.

61

As explained above with respect to the APA Facility Payments, the Court carries out the same two-step analysis in assessing whether CRS received reasonably equivalent value from payment of the Payroll Overdraft. The first step is to assess whether CRS received any value.

Here, unlike in the first claim, the Trustee does not seek to avoid CRS's guaranty obligation and instead maintains that the Payroll Overdraft was an obligation of Tri-State's rather than TSE's. (Plaintiff's Proposed Findings ¶¶ 330–332.) Thus, the Court finds it unnecessary to evaluate whether CRS incurred the guaranty obligation in exchange for reasonably equivalent value. Instead, the analysis must focus on whether CRS received some value and whether such value is the reasonably equivalent to the payment of Payroll Overdraft.

The Trustee argues that since the overdrafts in the TSE Payroll Accounts were "swept" into the Master Payroll Funding Account, the Payroll Overdraft constitutes an obligation of Tri-State. (*Id.*) The Court finds this argument unavailing because it exalts form over substance. *See* 5 COLLIER ON BANKRUPTCY ¶ 548.03[6] ("Fraudulent transfer law has always exalted substance over form.") The "real test of a fraudulent conveyance . . . is the unjust diminution of the debtor's estate." *See Orr,* 991 F.2d at 36 (quoting 1 Garrard Glenn, Fraudulent Conveyances and Preferences § 195, at 348 (rev. ed. 1940)).

It is undisputed that the Payroll Overdraft arose as a result of the overdrafts in the TSE Payroll Accounts and not any Tri-State Account. (Defendants' Proposed Findings ¶ 229.) While the overdrafts were first "swept" into the Master Payroll Funding Account, the overdrafts originated in and were charged to the TSE Payroll Accounts. (*Id.*) The Payroll Overdraft appeared in the TSE Payroll Accounts in the following manner:

- Pursuant to the established procedure between CRS and TSE and the existing cash management system, as a result of the presentment of payroll checks and other items on January 30, 2015, intra-day overdrafts were created in the TSE

62

Payroll Accounts (ending in 662, 670, 686 and 3002) totaling approximately
$2.5 million. (Joint Pre-Trial Order ¶ 142.)

- As a result of Wells Fargo's automated ZBA account process, and in accordance
  with ordinary pre-petition arrangements as set up by TSE and CRS, the TSE
  Payroll Accounts balances were brought to zero at the end of the day on January
  30, 2015. (*Id.*; Poole Dep. Tr. at 36:3–7.)

- The overdraft (negative) balances totaling $2,557,327.96 were moved from the
  four TSE Payroll Accounts to the Master Payroll Funding Account, causing a
  net negative (overdraft) balance in the Master Payroll Funding Account of
  $2,548,209.63 as of the close of business on January 30, 2015. (Joint Pre-Trial
  Order ¶ 144; Chobot Dep. Tr. 199:18–200:10; Trial Ex. 210.)

Further, despite the fact that the Payroll Overdraft was moved from the TSE Accounts to

the Master Payroll Funding Account, the Court finds that CRS guaranteed the overdrafts in the

specifically designated TSE Payroll Accounts and that CRS received value from the satisfaction

of its guaranty obligation. Here, CRS agreed to be held responsible for overdrafts or negative

balances arising in the specifically designated TSE Payroll Accounts that would be incurred over

that weekend and into the future. (Trial Ex. 19 at 1.) In particular, CRS agreed to "indemnify

and hold Wells Fargo harmless from any and all losses, expenses, claims, obligations, liabilities,

damages of any kind, nature or description *arising in connection with or related to the funding or*

*honoring by Wells Fargo of any such overdrafts or negative account balances*." (*Id.* (emphasis

added).) Here, the Payroll Overdrafts, if not paid by CRS, would have constituted Wells Fargo's

"losses . . . arising in connection with or related to the funding or honoring by Wells Fargo of . . .

overdrafts or negative account balances." Therefore, the Payroll Overdraft falls within the scope

of CRS's contractual obligation under the Indemnification Agreement. Importantly, CRS's later

payment of the Payroll Overdraft satisfied a pre-existing obligation. Section 548(d)(2) of the

Bankruptcy Code defines "value" to include "satisfaction or securing of a present or antecedent

debt of the debtor." 11 U.S.C. § 548(d)(2)(A). Thus, CRS received value from the payment of Payroll Overdraft.

Not only did CRS receive value, it also received value that was reasonably equivalent to the payment of the Payroll Overdraft. In *Rubin v. Manufacturers Hanover Trust Co.,* 661 F.2d 979, 991–92 (2d Cir. 1981), the Second Circuit held that an insolvent debtor's payment of another party's debt constitutes a constructive fraudulent conveyance unless the debtor receives an indirect benefit of reasonably equivalent value from the transfer. The court noted that the key consideration is whether the debtor's net worth has been preserved. *Id.* at 991; *see also Mellon Bank, N.A. v. Metro Commc'ns, Inc.,* 945 F.2d 635, 646–47 (3d Cir. 1991) (whether "the transaction conferred realizable commercial value on the debtor reasonably equivalent to the realizable commercial value of the assets transferred").

While this case differs from *Rubin* in that CRS paid its own debt, this Court follows the Second Circuit's guidance to look to indirect benefit for the purpose of determining reasonably equivalent value. Here, CRS received indirect benefit reasonably equivalent to the payment of the Payroll Overdraft—indirect in the sense that CRS did not receive benefit from Wells Fargo, the transferee. The Payroll Overdraft resulted from the presentment of two weeks of payroll checks for TSE's employees who were exclusively servicing CRS's customers. (Defendants' Proposed Findings ¶ 231.) The Court agrees with Wells Fargo that had it not honored those payroll checks, the 9,117 employees exclusively servicing CRS's customers would not have been paid and they would have reasonably been expected to quit. (*Id.*) This would have led to massive offsets and counterclaims by CRS customers against CRS's account receivables from those customers. (Trial Tr. at 133:24-137:11.) Thus, since the payment of Payroll Overdraft

64

prevented the damage of CRS's core assets, CRS's net worth has been preserved—the key consideration in *Rubin*.

Furthermore, Wells Fargo contends that in addition to payment of the employees, CRS received $15.6 million of new equivalent value from the invoices subsequently generated. (Defendants' Proposed Findings ¶ 232.) While the Court agrees that payment of the payroll checks indirectly generated future account receivables and brought more value to CRS, for the purpose of determining reasonably equivalent value, the Court need not ascertain the amount of invoices subsequently generated. Because this additional value adds to the payment of $2.5 million payroll checks, the Court finds that the realizable commercial value of the payment of Payroll Overdraft is greater than the Payroll Overdraft.

In conclusion, the Trustee fails to carry his burden in showing a lack of reasonably equivalent value. The Payroll Overdraft cannot be recovered as a constructive fraudulent transfer.

### C.    Post-Petition Bank Charges Are Recoverable

For the reasons explained below, the Court finds and concludes that the Trustee may recover the post-petition bank charges in the amount of $439,710.58.

The Trustee seeks to recover (i) $227,809.52 in bank service charges related to activity in Tri-State accounts (the "Tri-State Charges"); (ii) $147,000 in overdraft charges in TSE accounts (the "Overdraft Charges"); (iii) $8,379.64 in service charges related to unused accounts (the "Unused Account Charges"); and (iv) a $56,521.42 overcharge resulting from the $100,000 July 2015 service charge (the "July Overcharge"). (Plaintiff's Proposed Findings ¶¶ 345, 348, 354, 355.) The Trustee argues that these post-petition bank charges were improper because they violated the automatic stay and constituted constructive fraudulent transfers. (*Id.* ¶¶ 345–359.)

### 1. The Tri-State Charges Violated Automatic Stay and Are Void

Wells Fargo took an action against the debtor TSE and violated the automatic stay by assessing charges arising from activity in Tri-State accounts against TSE. Section 362(a)(3) of the Bankruptcy Code stays "any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate." 11 U.S.C. § 362(a)(3); *In re 48th St. Steakhouse, Inc.*, 835 F.2d 427, 430 (2d Cir. 1987). "The scope of the stay is broad, encompassing almost any type of formal or informal action taken against the debtor or the property of the bankruptcy estate." *In re Salov*, 510 B.R. 720, 726 (Bankr. S.D.N.Y. 2014) (citation and internal quotation marks omitted); *accord In re Cano*, 410 B.R. 506, 523 (Bankr. S.D. Tex. 2009) ("The automatic stay has broad application and acts to restrain creditors from taking any action to continue collection efforts against the debtor or property of the estate.").

It is undisputed that neither TSE nor the Trustee executed Commercial Account Authorization and Agreement (Signature Card), Master Agreement for Treasury Management Services, Acceptance of Services or any other document or agreement with respect to any TSE accounts that were opened post-petition. (Stipulated Facts ¶ 156.) Furthermore, TSE never signed any account agreement or other documentation agreeing to be liable for Tri-State charges or permitting Wells Fargo to assess Tri-State account charges against TSE's account. (Plaintiff's Proposed Findings ¶ 347.) Nor did this Court permit Wells Fargo to do so. (*Id.*) The Tri-State Charges are therefore void *ab initio*, and the Trustee may recover those charges.[2]

---

[2]        The Trustee also alleges that Wells Fargo, by assessing the Tri-State account charges to TSE, either (i) breached the implied covenant of good faith and fair dealing or (ii) was unjustly enriched. Because the transfers were void as violations of the automatic stay and recoverable by the Trustee on that basis, the Court declines to rule on the Trustee's unjust enrichment or good faith and fair dealing claims.

**2.    The Overdraft Charges Are Avoidable as Constructive Fraudulent Transfers**

The Trustee seeks to avoid the CRS Debtors' payment of $147,000 in Overdraft Charges as constructively fraudulent transfers. Following TSE's bankruptcy, TSE's bank accounts were funded with payments from the CRS Debtors. (Feltman Decl. ¶ 14.) These bank accounts were purposefully maintained with only small or even negative balances. (*Id.*) Even though funds were regularly needed to meet TSE's payroll and other employment-related obligations as the PEO for the CRS Debtors' businesses, TSE's bank accounts at Wells Fargo typically were not funded before checks and other items were presented for payment. (*Id.*) Instead, TSE's bank accounts at Wells Fargo were funded on an "as needed" or *post hoc* basis at the direction of Wells Fargo or the CRS Debtors' chief restructuring officer, thus purposefully and regularly resulting in overdraft situations in several of the TSE accounts. (*Id.*)

The Court finds that the Trustee has carried his burden of proof on this claim. First, Wells Fargo recorded advances against CRS's credit facility in the full amount of the overdraft fees and applied those advances to pay those charges. Thus, the payments constituted transfers of interests in the CRS Debtors' property. Second, it is undisputed that the payments were made to Wells Fargo. Lastly, Wells Fargo has stipulated, for purposes of this trial only, that the CRS Debtors were engaged in businesses or transactions for which their remaining property was unreasonably small capital.

Again, the Trustee's claim hinges on whether the CRS Debtors received reasonably equivalent value in exchange for the Overdraft Charges. The Court concludes that the CRS Debtors did not. First, the nature of the Overdraft Charges was suspect, as evidenced by the fact that the supposedly automated $35-per-check charges did not match the actual activity in the accounts. Chobot testified that the overdraft charge process was automatic and that the charge for checks paid while overdrawn was $35 per check. (Trial Tr. at 174:10-12, 19-22.) However,

upon review of the underlying bank statements, Chobot could not explain why TSE was assessed

monthly overdraft charges for 999 checks on several occasions even though the overdraft activity

in the underlying accounts reflected a significantly higher number of checks paid while the

account was overdrawn, nor could he explain a monthly overdraft charge for 100 checks when

the underlying account statement reflected that less than 100 checks had been presented for

payment on that account.  (Trial Tr. at 174:23–179:16; Trial Exs. 162, 163, 164, 227, 233, 235).

Moreover, the April 15, 2015 stipulation also provided for Wells Fargo's payment of any

overdrafts in TSE's Wells Fargo accounts, specifically providing that:

> Subject only to prior verification and review for fraud and misstatements, the
> Lenders shall pay any and all overdrafts on TSE's Wells Fargo bank accounts for
> obligations incurred by TSE in connection with payroll, payroll tax and payroll-
> related expenses commencing on and after the Trustee appointment and relating
> solely to TSE's operations and servicing with respect to customers of the CRS
> Borrowers.

(Stipulated Facts ¶ 165; Trial Ex. 55 ¶ 16.)

On cross-examination, Chobot conceded that under the April 15, 2015 stipulation, Wells

Fargo was responsible for paying overdrafts in the TSE accounts.  (Trial Tr. 185:6–18.)

Therefore, the Court concludes that Wells Fargo was responsible for the payment of all post-

petition overdrafts in TSE's payroll accounts, and therefore Wells Fargo never should have

assessed those charges in the first place.

The CRS Debtors could not receive value, let alone reasonably equivalent value, from the

improper Overdraft Charges for which Wells Fargo agreed to be responsible.  Accordingly, the

Trustee may avoid the CRS Debtors' payment of the post-petition overdraft charges as

constructive fraudulent transfers under Bankruptcy Code section 548(a)(1)(B) and may recover

those amounts from Wells Fargo, the initial transferee.[3]

      As explained above, Wells Fargo bears the burden of proving value and good faith to

assert an affirmative defense under section 548(c).  The Court finds that Wells Fargo has failed

to carry the burden of proving value.  Wells Fargo maintains that the Overdraft Charges were

incurred as a result of the manner in which the Trustee and his professionals maintained the TSE

Payroll Accounts to assure that any checks presented were legitimate and not fraudulent.  Wells

Fargo explains that under the procedure that was established, when checks were presented and

debited to one of the five TSE Payroll Accounts, the Trustee and his professionals first validated

that the checks were legitimate before CRS made a draw request to cover the payment.  Wells

Fargo asserts that because this process, as implemented by the Trustee and his professionals,

often took longer than the same day to complete, an overnight overdraft was often created,

resulting in charges.  (Chobot Decl. ¶ 91, Trial Tr. 184:8–22; Montemarano Dep. Tr. 108:24–

109:15.)  However, the process was necessary to ensure that "there was no other less than honest

things" occurring with the payroll," to make certain that everyone that was getting paid created

an invoice that created billings and ultimately a recovery to CRS.  (Montemarano Dep. Tr.

108:14–109:15.)

      Wells Fargo's argument is unavailing.  The Debtors certainly received value from the

validation of checks by the Trustee and his professionals because this procedure safeguarded the

estates' assets.  The validation of checks, however, should not be equated with and did not

warrant the Overdraft Charges.  Importantly, any "invoice that created billings and ultimately a

---

[3]     The Trustee also alleges that the overdraft charges were assessed in breach of the covenant of good faith and fair dealing implicit in the April 15, 2015 stipulation. Because the overdraft payments are recoverable as constructively fraudulent transfers, the Court does not need to decide these claims.

recovery to CRS" certainly did not result from the Overdraft Charges. It was the services provided by temporary employees—rather than the Overdraft Charges—that created invoices and ultimately a recovery to CRS.

### 3. The Unused Account Charges Are Recoverable as Constructive Fraudulent Transfers

From March through August 2015, Wells Fargo assessed $8,379.64 in postpetition service charges relating to the three accounts opened post-petition and a fourth unused TSE account. (Stipulated Facts ¶ 187.) The evidence showed that neither the Trustee nor the chief restructuring officer even knew that these accounts had been opened, or that any charges were being assessed with respect to the accounts. Wells Fargo also presented no evidence showing any agreement under which either TSE or the Trustee should be liable for those charges, and offered no justification whatsoever during the trial for these charges. For the same reasons set forth above with respect to the Overdraft Charges, the Trustee may recover these charges as constructive fraudulent transfer from Wells Fargo.

### 4. The July 2015 Overcharge is Recoverable as a Constructive Fraudulent Transfer

Wells Fargo asserts that the $100,000 July 2015 charge was a reserve for future unpaid bank charges. However, Wells Fargo does not dispute that the July 2015 charge exceeds the combined amount of all TSE and Tri-State post-petition services charges—both legitimate and illegitimate—by $56,521.42. Assuming the July 2015 charge is a reserve, Wells Fargo has failed to offer any evidence or explanation why the excess balance should not be returned. Thus, for the same reasons articulated above, the Trustee may recover $56,521.42 of the July 2015 charge because it was constructively fraudulent as to the CRS Debtors.

70

### 5.  The Trustee Is Not Entitled to Punitive Damages

The Trustee argues that Wells Fargo's assessment of Post-Petition Bank Charges

warrants the award of punitive damages.  (Plaintiff's Proposed Findings ¶ 356–359.)  "A

Bankruptcy Court has the power to issue contempt orders pursuant to statute."  *Dorsagno v.*

*Cooley*, 1996 WL 312180, at *2 (N.D.N.Y. May 31, 1996) (citing 11 U.S.C. § 105(a)).  That

power extends to willful violations of the automatic stay.  *See e.g. Maritime Asbestosis Legal*

*Clinic v. LTV Steel Co., Inc. (In re Chateaugay Corp.),* 920 F.2d 183, 186–87 (2d Cir.1990); *In*

*re Congregation Birchos Yosef,* 535 B.R. 629, 635 (Bankr. S.D.N.Y. 2015).

In this Circuit, willful stay violations may be sanctionable under a contempt standard

unless the putative violator "had acted without maliciousness and had had a good faith argument

and belief that its actions did not violate the stay." *Crysen/Montenay Energy Co. v. Esselen*

*Assoc., Inc. (In re Crysen/Montenay Energy Co.),* 902 F.2d 1098, 1104 (2d Cir. 1990).  The party

seeking to hold another in civil contempt has the burden of establishing a willful violation, which

it must show "by clear and convincing evidence."  *In re Manchanda*, 2016 WL 3034693, at *4

(Bankr. S.D.N.Y. May 19, 2016).

The Court is troubled by some of Wells Fargo's conduct during this case—particularly its

lack of transparency and failure to disclose charges it was imposing on the CRS Debtors'

accounts until the Trustee's diligent efforts disclosed what had been done.  The Court views the

issue whether to impose punitive damages under these circumstances to be a very close question.

Nevertheless, the Court declines to impose punitive damages because, the Court finds, the

Trustee failed to establish by clear and convincing evidence that Wells Fargo knowingly and

willfully violated the automatic stay.  While the Court has no doubt that Wells Fargo acted

throughout this case to minimize its own risk—in fact, as explained above, Wells Fargo

71

successfully recovered the full amount of its outstanding loans and then some—it is also true that

in the chaos that followed the disclosure of the Debtors' tax fraud, and the filing of the TSE

chapter 11 case, faced with less than complete information, Wells Fargo's actions helped

minimize the very substantial harm that would have resulted to many people if the CRS Debtors

temporary employees had not been paid.  While the Court has concluded that the Trustee may

recover the Post-Petition Bank Charges, the Court finds that the Trustee failed to prove by clear

and convincing evidence that Wells Fargo willfully violated the automatic stay, or that its

conduct was malicious, or that it did not have a good faith argument that the fees it collected did

not violate the stay.

### D.    The Trustee Cannot Recover the WFFL Lease Payment

The Trustee seeks to recover $240,220.26 relating to the WFFL Copier Lease Payment.

The Court finds and concludes that the Trustee may not recover the lease payment.  This claim

consists of three parts: (1) $183,791.25 of the transfer related to eleven copier leases between

WFFL and CRS; (2) an additional $54,600.19 in transfers related to six copiers leased by WFFL

to three Tri-State entities—Staff Management Group, LLC, Tri-Diamond Staffing Inc., and Tri-

State Employer Services; and (3) the remaining $1,828.82 that was transferred to WFFL on

account of a CRS Subsidiary copier lease (TS Staffing Corp.).  (*See* Feltman Decl.,

Demonstrative Ex. G.)  The Court analyzes these three sub-claims in turn.

A transfer may be avoided as a preference if it (1) was a transfer of an interest of the

debtor in property, (2) was made to or for the benefit of a creditor, (3) was made for or on

account of an antecedent debt owed by the debtor before such transfer was made, (4) was made

while the debtor was insolvent, (5) was made on or within 90 days before the date of filing of the

petition (assuming the transferee is not an insider), and (6) enabled the transferee to receive more

72

than it would have received had the case been a chapter 7 liquidation and the creditor not received the transfer.  11 U.S.C. § 547(b).  The Trustee bears the burden of proving these elements by a preponderance of the evidence.  *In re Roblin Indus., Inc.*, 78 F.3d 30, 34 (2d Cir. 1996).

The Parties stipulated that on June 30, 2015, CRS transferred $240,220.26 to WFFL to pay off seventeen copiers that were leased from WFFL, and that the transfer constituted a transfer of an interest in CRS's property.  (Joint Pre-Trial Order ¶¶ 203–204.)  Hence, the first, second and fifth elements of section 547(b) are satisfied.  The first sub-claim is based on the eleven copier leases between WFFL and CRS.  (*See* Feltman Decl., Demonstrative Ex. G.) Therefore, $183,791.25 of the transfer was made on account of an antecedent debt owed by CRS. *See, e.g.*, *In re Tanner Family, LLC*, 556 F.3d 1194, 1198 (11th Cir. 2009) (finding that termination payment that discharged debtor's obligations under a lease agreement was "for or on account of an antecedent debt").  Here, as to the first sub-claim, the third element of section 547(b) is satisfied.  Furthermore, CRS is presumed to be insolvent during the 90 days preceding its bankruptcy.  11 U.S.C. § 547(f).  The Trustee has presented some evidence demonstrating CRS's insolvency.  (*See* Feltman Decl. ¶¶ 81,110.)  And WFFL has presented no evidence rebutting either the statutory presumption or the Trustee's evidence.  Thus, the fourth element of section 547(b) is met.

After satisfying the first five elements of section 547(b), Trustee bears the burden of proving the sixth element by a preponderance of the evidence.  *Roblin* 78 F.3d at 34.  The Court finds credible the Trustee's testimony that the priority and unsecured claims against CRS's bankruptcy estate exceed the value of the estate's remaining assets and that there is no realistic scenario in which general unsecured creditors of CRS will receive a 100% distribution on

73

account of their claims.  (Feltman Decl. ¶ 165.)  Given that WFFL was fully repaid on the copier

leases, the question then becomes whether the trustee can show by a preponderance of the

evidence that WFFL's claims were not fully secured pursuant to the APA Facility and related

documents.  Payments to a fully secured creditor are not preferential because the creditor would

receive the full value of its collateral in a chapter 7 liquidation.  *Ray v. City Bank & Trust Co. (In

re C–L Cartage Co.*), 899 F.2d 1490, 1493 (6th Cir. 1990); *see Committee of Creditors Holding

Unsecured Claims v. Koch Oil Co. (In re Powerine Oil Co.*), 59 F.3d 969, 972 (9th Cir. 1995).

As to the first sub-claim in the amount of $183,791.25, the Trustee fails to establish that

the transfer enabled WFFL to receive more than it would have received had the case been a

chapter 7 liquidation and the creditor not received the transfer.

First, the Court finds and concludes that the Bank Products Supplement covers the WFFL

leases.  The Bank Products Supplement defined "bank product" as "any financial

accommodation extended to a Customer by a Bank Product Provider including: (a) credit cards,

(b) credit card processing services, (c) debit cards, (d) purchase cards, (e) ACH Transactions, (f)

cash management, including controlled disbursement, accounts or services, or (g) transactions

under Hedge Agreements."  (Trial Ex. 21 ¶ 2.)  The Court disagrees with the Trustee's

contention that each of the bank services listed in this definition is a traditional banking service

or product and that in context, there is no fair reading of the Bank Products Supplement under

which copier leases can be considered a "financial accommodation" of the type referenced in this

definition.  (Plaintiff's Pre-trial Brief, ECF Doc. # 24 at 25.)  Upon reviewing the relevant lease

agreements (Trial Exs. 107–111), it appears that WFFL lent money to CRS so that it could lease

the equipment from DocuTrend Inc.  If lending does not constitute a traditional banking service,

the Court is at a loss as to what does.  Moreover, the scope of "any financial accommodation" is

broad, and the word "including" means the enumerated examples are not exhaustive.  Lastly, given that a Bank Product Provider is defined as "Wells Fargo Bank, National Association or any of its affiliates" and WFFL is a subsidiary of Wells Fargo, WFFL is an "affiliate" and thus a Bank Product Provider.  (Trial Ex. 21; Joint Pre-Trial Order ¶ 12.)  Thus, it stands to reason that the WFFL leases at issue fall within the scope of "bank product."

Furthermore, the Court finds that in the Bank Product Supplement, the CRS Subsidiaries acknowledged, confirmed and agreed that all "Bank Product Obligations" of any of the CRS Subsidiaries constitute part of the indebtedness and liabilities of the CRS Subsidiaries to Wells Fargo under the APA Facility and are secured by the accounts and other assets of the CRS Subsidiaries upon which Wells Fargo at any time has a lien or security interest under or in connection with the APA Facility.  (Joint Pre-Trial Order ¶ 202, Trial Ex. 21.)  The Court's finding is based on the following provisions in the Bank Product Supplement:

(1) This Supplement shall constitute a supplement to the Account Purchase Agreements, is hereby incorporated into the Account Purchase Agreements, shall have a term concurrent therewith and is made a part thereof.

(2) All Bank Product Obligations . . . shall constitute part of the indebtedness and liabilities of Customers to WFB under the Account Purchase Agreements, and be secured by the Accounts and all other assets of Customers upon which WFB at any time has a lien or security interest under or in connection with the Accounts and all other assets of Customers upon which WFB at any time has a lien or security interest under or in connection with the Account Purchase Agreements.

(Trial Ex. 21 at 1.)

As to the second sub-claim, the Trustee is seeking to recover under a fraudulent transfer theory.  (Plaintiff's Proposed Findings ¶ 369.)  Again, the central inquiry is whether CRS received reasonably equivalent value from the payment of six copier leases between WFFL and three Tri-State entities.  WFFL contends that CRS received consideration from the sale of the

copiers as a part of the sale of the various CRS's businesses.  (Defendants' Proposed Findings ¶ 266.)

Here, the Trustee has the burden to show a lack of reasonably equivalent value and the Trustee has failed to do so.  The copiers were sold or disposed prior to the Trustee's appointment as CRS's Trustee.  (Joint Pre-Trial Order ¶ 206.)  The Trustee does not know and has not shown either what happened to the photocopiers or the consideration received by CRS for the photocopiers.  (Feltman Dep. Tr. at 110:16–112:24.)  Moreover, the Trustee did not attempt to find out what happened to the copiers or even the identity of the entity in possession of the copiers.  (*Id.* at 113:5–21 ("I can't recall that I have undertaken any activity to find out what happened to the Wells-Fargo-financed copiers.").)

The same analysis applies to the third sub-claim in that the Trustee failed to carry the burden of proof in showing CRS did not receive reasonably equivalent value from the sale of the copiers.  In addition, because CRS was obligated to pay the WFFL leases under the APA Facility and Bank Product Supplements (Joint Pre-Trial Order ¶ 34–35), the payment to WFFL satisfied an antecedent debt that constituted reasonably equivalent value.

### E.    Order for Accounting of Reimbursed Legal Fees

Wells Fargo reimbursed itself for more than $2 million in legal fees with advances against the APA Facility or cash collateral it held.  (*See* Trial Exs. 93–106; Feltman Decl. ¶¶ 183–84; Demonstrative Ex. J.)  Wells Fargo's counsel in this case charged more than $1.7 million of those legal fees.  A material portion of the legal fees is not subject to indemnification and thus recoverable by the Trustee.  First, some of the legal fees and expenses arose from disputes with Tri-State entities or from the Trustee's preference claims against WFFL (the "Unrelated Legal Charges").  The Debtors' estates are not obligated to indemnify Wells Fargo's

76

counsel for fees incurred for such matters.  Second, Wells Fargo is entitled to indemnification of

legal fees only to the extent they relate to claims for which Wells Fargo is the prevailing party.

### 1.  The Trustee is Entitled to Recover the Unrelated Legal Charges

The CRS Debtors are not responsible for legal charges unrelated to the APA Facility.  In

the APAs, CRS Subsidiaries agreed to indemnify Wells Fargo for claims "*arising out of or*

*otherwise relating to [the APA], any Related Document, the transactions contemplated hereby*

*and thereby, any Purchased Account, any Related Rights, any Collateral*" and excluding "any

Indemnified Liability caused directly by the gross negligence or willful misconduct of such

Indemnitee."  (Trial Ex. 1 § 11.07 (emphasis added).)  Moreover, the CRS Debtors agreed to

indemnify Wells Fargo for "all costs and expenses, including reasonable attorneys' fees, incurred

in connection with" the APAs and related documents.  (Trial Ex. 1 § 11.19.)  Additionally,

substantially all amendments to the APA Facility provide that the applicable CRS Subsidiary

shall "pay or reimburse [Wells Fargo] on demand for all costs and expenses incurred by [Wells

Fargo] *in connection with the Account Purchase Agreement and the Related Documents,*

including without limitation all disbursements and reasonable fees of counsel."  (Trial Ex. 13 ¶

10 (emphasis added).)  Under a plain reading of the relevant contracts, no agreement mandates

the CRS Subsidiaries to indemnify Wells Fargo for legal charges incurred in connection with

disputes between Wells Fargo and Tri-State or defense of WFFL under the copier leases.

### 2.  Trustee is Entitled to Recover the Legal Charges for Claims in which the Trustee Prevails

The CRS Debtors are not responsible for legal charges for claims in which the Trustee

prevails.  The APA Facility is governed under Colorado law.  (*See e.g.* Trial Ex. 1 § 11.09 ("This

Agreement shall be governed by and construed in accordance with the substantive laws (other

than conflict laws) of the State of Colorado.").)  In *Klein v. Tiburon Development LLC,* 405 P.3d

77

470, 476 (Colo. App. 2017), the Colorado Court of Appeals held that it would violate public policy to uphold the clause in a lending agreement indemnifying the defendants' attorney fees, given that the defendants had failed to prevail on most of their claims and received sanctions for conduct during litigation.   There, the court emphasized that "determining who prevailed is critical to resolving the issue of whether the provision in the [defendants'] favor violates public policy."   *Id.*   Under Colorado law, a prevailing party is one that "prevails on a significant issue in the litigation and obtains some of the relief sought."   *Grynberg v. Agri Tech, Inc.,* 985 P.2d 59, 64 (Colo. Ct. App. 1999) (citing *Archer v. Farmer Bros. Co.,* 90 P.3d 228, 230 (Colo. 2004)). When a case involves several claims and a mixed outcome, the trial court has the discretion to determine who the prevailing party is.   *See id.*   Here, the Court views the Trustee as the prevailing party in his successful claims: (i) $4.1 million of APA Facility Payments; (ii) $227,809.52 of Tri-State Charges; (iii) $147,000 of Overdraft Charges; (iv) $56,521.42 of the July Overcharge; and (v) a material portion of the Legal Charges.   Thus, the Trustee is entitled to recover the legal fees that Wells Fargo already collected related to these claims.

### 3.   Wells Fargo's Response

Wells Fargo maintains that two stipulations with the Trustee support the reimbursement of Wells Fargo's legal fees.   (Defendants' Proposed Findings ¶ 268.)   The first stipulation provides that "[f]or the avoidance of doubt, cost, fees and expenses incurred by the Lenders in connection with the TSE payroll, except as set forth above, shall be repaid with the TSE Advance in accordance with paragraph 13."   ("First Stipulation," Trial Ex. 55 ¶ 20.)   Wells Fargo then relied on another stipulation, which provides:

> additional amounts remain owing by CRS to Wells Fargo under the CRS Loan Facility, and additional amounts may become owing by CRS to Wells Fargo, on account of account charges, legal fees and expenses, consultant fees and expenses, overdraft balances, and other amounts for which CRS has agreed to pay or

78

reimburse Wells Fargo pursuant to the CRS Loan Facility . . . and on account of
certain indemnification obligations of CRS to Wells Fargo.

("Second Stipulation," Trial Ex. 58 at 3, together with the First Stipulation, the "Stipulations.")

Wells Fargo's reliance on the Stipulations is misplaced, and the Court addresses the

Stipulations in turn.  Wells Fargo's argument with respect to the First Stipulation fails because it

does not pertain to the CRS Debtors' obligation to indemnify Wells Fargo for legal fees under

the APA Facility.  Here, the Trustee entered into the First Stipulation after TSE's bankruptcy but

before CRS's bankruptcy to ensure funding from CRS under the existing APA Facility with

Wells Fargo.  (Trial Ex. 55 at 2 ("[T]he Trustee requires certain assurance from CRS and the

Lenders that they will continue funding certain payroll expenses of the Estate. . . .").)  Moreover,

the First Stipulation defines the TSE Advance as "advance to the Trustee . . . by the Lenders

pursuant to the CRS Loan Facility up to the amount of $1,000,000. . . ." (*Id.* ¶ 3.)  Because the

scope of the First Stipulation is confined to the TSE Advance, the First Stipulation has no

bearing on the CRS Debtors' obligation to indemnify Wells Fargo for legal fees under the APA

Facility.

Wells Fargo's argument with respect to the Second Stipulation fails because it confirms

rather than broadens CRS Debtors' indemnity obligation under the APA Facility.  The language

cited by Wells Fargo appears in one of the "whereas" sections of the stipulation as background

information, and it precedes the language "it is hereby stipulated and agreed as follows."

(Second Stipulation at 3–4.)  Furthermore, the language on which Wells Fargo relied echoes the

language describing CRS Debtors contractual indemnity obligation in the APA Facility.  Here,

the two Stipulations do not affect the CRS Debtors' indemnity obligations.

### 4.    Order for Accounting of Legal Fees

Under Colorado law, a party seeking reimbursement for attorney fees bears the burden of demonstrating its entitlement to those fees. *See Monday v. Robert J. Anderson, P.C.*, 77 P.3d 855, 857 (Colo. App. 2003). A party cannot meet this burden with conclusory statements. *See Moore v. W. Forge Corp.*, 192 P.3d 427, 440 (Colo. App. 2007). Wells Fargo already collected the legal fees but that does not shift the burden to the Trustee—it is Wells Fargo that is claiming entitlement to fees and it bears the burden of proof. Wells Fargo's counsel only provided vague descriptions in its time records, making it impossible to determine whether the work involved the Debtors or pertained to matters for which the Trustee has now prevailed. For instance, Wells Fargo's counsel described some of the tasks performed as "Special Issues," "Analysis of Correspondence," and "Preparation of Legal Papers." (Trial Ex. 93–106.)

In light of these vague descriptions, the Trustee suggests that the Court should presume that Wells Fargo's counsel devoted an equal amount of time to each of the five claims at issue, and that the Court should direct Wells Fargo to disgorge 20% of its legal fees paid in total with respect to each claim on which the Trustee prevails. In light of the outcome of the trial, this methodology would dictate that Wells Fargo should disgorge 60% of its legal fees because the Trustee has now prevailed on three of the five claims. Since the five claims vary in amount and complexity, the Court cannot find that a reasonable counsel would have committed an equal amount of time to the defense of each claim. Thus, the Court declines to adopt the Trustee's proposal.

Instead, unless the parties are able to resolve the claim consensually, the Court considers an accounting for the legal fees to be an appropriate remedy at this point; both New York law

80

and the Bankruptcy Code[4] provide the authority to order accounting.  An accounting, as recognized by the First Department in *Kaminsky v. Kahn*, "is a well-recognized form of equitable relief."  23 A.D.2d 231, 240, 259 N.Y.S.2d 716, 726 (1st Dep't 1965).

> The fact that a case involves the consideration and adjudication of issues relating to an account of a complicated character . . . is ordinarily a sufficient reason for a court of equity to assume jurisdiction thereof, upon the ground of its superior equipment to handle and dispose of such issues.

1 N.Y. Jur.2d Accounts and Accounting § 34 (citing *Townsend v. John B. Carter Co.,* 165 A.D. 973, 150 N.Y.S. 757 (1st Dep't 1914); *Chase v. Knickerbocker Phosphate Co.*, 32 A.D. 400, 53 N.Y.S. 220 (2d Dep't 1898)).

These authorities remain valid today.  And courts in other jurisdictions recently articulated this same principle.  For instance, under Florida law, to be entitled to an equitable accounting, "a party must show either (1) *a sufficiently complicated transaction* and an inadequate remedy at law *or* (2) the existence of a fiduciary relationship."  *Zaki Kulaibee Establishment v. McFliker,* 771 F.3d 1301, 1310 & n. 21 (11th Cir. 2014) ("*Zaki Kulaibee* ") (emphasis added).  In *Zaki Kulaibee,* the Eleventh Circuit found an accounting to be the appropriate remedy where "without the foundational information that an accounting would have provided, [the plaintiff] was incapable of quantifying its damages, and was thereby precluded from obtaining any meaningful relief."  *Id.* at 1314.

An equity court[5] can "exercise its discretion in the matter and deny the accounting where it appears that the complexity is not of such extent or degree as to render legal remedies

---

[4]    While the Trustee did not assert any claim for accounting in the Complaint, this Court has the power to order accounting *sua sponte* under section 105 of the Bankruptcy Code.

[5]    The Supreme Court has long recognized that bankruptcy courts are courts of equity that apply equitable principles in the administration of bankruptcy proceedings.  *See Local Loan Co. v. Hunt,* 292 U.S. 234, 240 (1934).  While the enactment of the Bankruptcy Code in 1978 "increased the degree of regulation Congress imposed upon bankruptcy proceedings," it did not alter their "fundamental nature" as courts of equity.  *Official Comm. of Unsecured Creditors of Cybergenics Corp. ex rel. Cybergenics Corp. v. Chinery,* 330 F.3d 548, 567 (3d

inadequate, or that the accounting would result in a great inconvenience and possible oppression to the defendant." 1 N.Y. Jur.2d Accounts and Accounting § 34. Here, it is too soon for this Court to make such a determination. Wells Fargo contends that the Trustee has failed so far to establish damages. But, as the Court concluded above, Wells Fargo is the party seeking to recover attorneys' fees (which it has already paid itself), and Wells Fargo rather than the Trustee has the burden of proof. Another reason that Wells Fargo has the burden of proof in the circumstances is that it possesses much better information than the Trustee about the basis for the fees, and Wells Fargo has failed to provide sufficiently detailed time records from which the Court can determine Wells Fargo's entitlement to retain the fees it used self-help to collect. This is the kind of situation in which cases such as *Zaki Kulaibee* authorizes an accounting.

The Court hopes that with the Court's ruling on the remaining claims in hand, the parties will be able to resolve the attorneys' fees issue consensually. If the parties are unable to resolve the attorneys' fees issue on or before March 28, 2019, they should propose a schedule to the Court for discovery, briefing, and an evidentiary hearing to resolve this issue.

## VII.    CONCLUSION

For the reasons detailed above, the Trustee may recover the following transfers:

1. $4.1 million of APA Facility Payments;
2. $227,809.52 of Tri-State Charges;
3. $147,000 of Overdraft Charges;
4. $56,521.42 of the July Overcharge;
5. $8,379.64 of the Unused Account Charges; and
6. A portion of the legal fees, pending proper accounting.

---

Cir.2003) (en banc); *see also Young v. United States,* 535 U.S. 43, 50 (2002) ("[B]ankruptcy courts . . . are courts of equity and 'apply the principles and rules of equity jurisprudence.'") (citation omitted).

Additionally, the Trustee may be entitled to recover prejudgment interest. *See, e.g., McHale v. Boulder Capital LLC (In re The 1031 Tax Group)*, 439 B.R. 84 (Bankr. S.D.N.Y. 2010). The parties shall try to reach agreement on the amount of prejudgment interest and on the attorneys' fees. Entry of a final judgment must await resolution of those issues.

Counsel shall meet and confer in an effort to resolve those issues and shall file a status letter on or before 5:00 p.m., March 28, 2019, including a proposed schedule for further proceedings. If the parties are unable to resolve the remaining issues, counsel shall appear for a case management conference at 2:00 p.m., April 9, 2019, at which time the Court will set a schedule for remaining proceedings.

**IT IS SO ORDERED.**

Dated:    February 28, 2019
          New York, New York

*Martin Glenn*
MARTIN GLENN
United States Bankruptcy Judge

83